The **OFFICERS FOR JUSTICE et al.,**
Plaintiffs,

v.

The **CIVIL SERVICE COMMISSION OF the CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.**

No. C–73–0657 RFP.

United States District Court,
N. D. California.
May 2, 1975.

See also, D.C., 371 F.Supp. 1328.

William H. Hastie, Jr., Erica B. Grubb, Sidney M. Wolinsky, Public Advocates, Inc., San Francisco, Cal., Lowell D. Johnston, William Bennett Turner, William E. Hickman, NAACP Legal Defense and Educational Fund, Inc., San Francisco, Cal., for plaintiffs.

Michael C. Killelea, Philip S. Ward, San Francisco, Cal., for defendant, Civil Service Commission of the City and County of San Francisco.

William T. Beirne, O'Byrne & Beirne, James M. MacInnis, San Francisco, Cal., for intervenors, San Francisco Police Officers Ass'n.

Jerome A. DeFilippo, Counsel to the Chief of Police, Office of Legal Affairs, San Francisco Police Dept., San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER

PECKHAM, District Judge.

Presently before the court are plaintiffs' motions for a preliminary injunction eliminating the 5′6″ pre-selection height requirement for Q–2 patrol officers, and banning discrimination against women and male members of ethnic minority groups. Defendants oppose all of plaintiffs' motions, contending that the selection procedures utilized by the San Francisco Civil Service Commission are valid and that patrol officers should be hired from the resultant list of eligible applicants.

## PRE-SELECTION HEIGHT REQUIREMENT

Plaintiffs challenge the 5′6″ minimum height requirement as discriminatory against certain groups, in particular, Asians, Latins and females. They point to certain demographic data which indicates that the average height of these groups of people is lower than the average height of Black and Caucasian males. This court need not rely on these general census statistics. It is clear from the height data on the applicants for Q–2 patrol positions that the 5′6″ height requirement discriminates against Asians, Latins and females. See court's Exhibits 16M, 16W, 16–C, 16–S and 16–A.

■ The statistical data before this court is sufficient to establish a *prima facie* case of employment discrimination where, as here, the selection device is *per se* discriminatory, that is, it has an *a priori* foreseeably exclusionary effect that is evident before the actual application of the device to a body of applicants. This situation presents an even more compelling case for the plaintiffs than where the selection device is facially neutral and the discriminatory effect only incidentally manifests itself in the course of application. *See* Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Gregory v. Litton Systems, Inc., 316 F.Supp. 401 (C.D.Cal.1970), modified, 472 F.2d 631 (9th Cir. 1972). The "disproportionate ethnic and sexual impact" produced by this selection device establishes the plaintiffs' *prima facie* case. Boston N.A.A.C.P. v. Beecher, 504 F.2d 1017 (1st Cir. 1974).

■ Once the *prima facie* case has been established, the burden of proof shifts to the defendants to demonstrate that the selection requirement is job-related. *See* Vulcan Society v. Civil Service Commission, 490 F.2d 387, 392 (2nd Cir. 1973); Boston N.A.A.C.P. v. Beecher, *supra*; Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1335–39 (2nd Cir. 1973). E.E.O.C. Guidelines, § 1607.3, 29 C.F.R. § 1607.3.

The only attempt defendants have made to uphold the validity of the height requirement is by means of the affidavit of John L. Reed, (3:17–5:3 *) and attached exhibits. The affidavit sets forth the results of a police department legal office survey of the relationship of height to assaultive conduct against police officers, the number of citizens' complaints against police officers, and the number of injuries sustained by officers while in the performance of their duties.

First of all, the survey suffers from a number of methodological defects, including the lack of data about officers under 5′7″ because none are officers on the force, the failure to take into account the experience of the officers be-

---

* This reference refers to page 3, line 17 to page 5, line 3 of the Reed affidavit.

ing sampled, and a lack of specificity regarding the extent of involvement of the officer that was required before an incident was regarded as assaultive conduct against an officer. Secondly, even on the merits, it is unclear that the data supports the defendants' position. Exhibit E–1 to the Reed affidavit indicates that officers of the heights 5′7″, 5′9″, 6′2″, 6′3″, 6′4″ and 6′5″ tend to be involved in more resisted arrests than officers 5′8″, 5′10″, 5′11″, 6′0″ and 6′1″. Officers 5′8″ and 5′10″ have the lowest rate of resisted arrests. While the data tends to indicate that the height of officers is inversely related to the frequency and severity of resistance to their arrest attempts, it is too inconclusive and inconsistent to support a finding for either position. The data regarding citizen complaints against police officers, incidents involving excessive use of force, and line of duty injuries with resultant lost time also either tend to indicate better results from shorter officers or are too inconclusive to support any finding.

■ This court, therefore, finds the Reed affidavit insufficient to sustain defendants' burden of justifying the pre-selection height requirement with its significantly adverse impact against Asians, Latins and females. Preliminary injunctive relief is appropriate here in light of the extremely high likelihood that plaintiffs will prevail on the merits of this issue. This court's conclusion is consistent with Smith v. City of East Cleveland, 363 F.Supp. 1131 (N.D.Ohio 1973), the federal case most closely on point holding that the height and weight requirements of the police department of the City of East Cleveland unlawfully discriminated against female applicants and Hardy v. Stumpf, 37 Cal.App.3d 958, 112 Cal.Rptr. 739 (1st Dist. 1974), holding that the height and weight requirements for the position of police officer in the City of Oakland discriminate against women as a class and that the record evidence did not support the trial court's finding that the size require-

ments were reasonably related to the position.

Accordingly, it is hereby ordered that defendants are enjoined from (1) having or promulgating any minimum height requirement for Q–2 patrol officers which has not been fully validated as necessary to the effective operation of the police force; and (2) proceeding with their present 5′6″ minimum height requirement for Q–2 patrol officers until such time as they can demonstrate to the court that the requirement has been properly validated as necessary to the effective operation of the San Francisco Police Department.

## HIRING OF FEMALE APPLICANTS

Women have historically been totally excluded from positions as patrol officers in the San Francisco Police Department. Women were permitted only as Q–20 policewomen, nonsworn positions involving principally clerical type duties, work as jail matrons and on the vice squad, and other strictly limited nonpatrol work. Until recently, Q–20 policewomen were not eligible for promotion to the rank of Sergeant or higher within the Department. After the filing of this action, defendants opened up the Q–2 Policeman classification to women and made it the Q–2 Police Officer classification. Additionally, defendants have equalized the salaries and promotional eligibility of the Q–20 and Q–2 positions.

Plaintiffs contend that, while Q–2 positions are now formally open to women, defendants continue in fact to discriminate against women, principally by means of the new 5′6″ minimum height requirement and the new physical agility test. This court has enjoined the pre-selection height requirement, *supra*, so it need not be discussed further. The physical agility test has a very significant, almost total, adverse impact on female applicants for positions as Q–2 patrol officers. Plaintiffs challenge the test as discriminatory against women, seeking an injunction restraining de-

fendants from using the test as a device for selecting female patrol officers and an order directing that 40%· of all future appointments from the present Q–2 eligibility list be women. Defendants and intervenors oppose plaintiffs' motions, contending that the physical agility test has been properly validated so that any adverse impact it has against female applicants is permissible.

■ Several weeks of live testimony, numerous affidavits, and voluminous briefs have been presented to this court directed to the issue of the validity of the San Francisco physical agility examination. The examination results establish that the physical agility test has a very significant adverse impact against women. At the cut-off score which defendants initially recommended, only two of the 166 eligible women would pass, while 573, or 63'%· of the 906 eligible men would pass. Of course, since it is a ranked test, even those two women who passed would be far down on the final list. This statistical disparity between the results of male and female applicants establishes a *prima facie* case of employment discrimination on the basis of sex.[1]

Once the *prima facie* case has been established, a heavy burden shifts to the defendant to show the validity of the selection device. As it was stated with respect to racial discrimination in Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), "[t]he touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." The *Griggs* case dealt with racial discrimination under Title VII of the Civil Rights Act of 1964. This lawsuit is brought under the general civil rights statutes contained in Title 42 of the United States Code, with sex discrimination the focus of the instant attack on the validity of the physical agility test. These distinctions do not detract from the persuasiveness of *Griggs* and its progeny. While sex has not formally been found to be a suspect classification like race and alienage, *see e. g.,* Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct.

1. The hearings on the issue of the physical agility test proceeded on the premise, initially assumed by all the parties, that the statistical disparity established plaintiffs' *prima facie* case, thereby shifting the burden of justifying use of the device to the defendants. At the final session of oral argument, counsel for the defendants argued for the first time that plaintiffs had not established their *prima facie* case. Defendants' argument ran roughly as follows: The physical agility test primarily measures strength, in particular upper body strength. Women as a class tend to have less upper body strength than men as a class. As a consequence of this fact, women as a class do less well than men as a class on the physical agility test. Since this result is precisely what would be expected to happen given that women are generally less strong than men, the fact that a statistical disparity exists does not establish plaintiffs' *prima facie* case of sex discrimination. The test disfavors women not because they are women, but because they are not as strong as men.

This argument is sheer sophistry. Suppose an employer hired applicants on the basis of a physical characteristic that tended to be correlated with an individual's ethnic back-

ground, advantaging persons of certain races at the expense of other races. Certainly, the employer, when sued, could not argue that the statistical disparity did not make out a *prima facie* case because the racial discrimination was expected, given the difference in physical features. Rather, the plaintiffs' burden of establishing a *prima facie* case of racial discrimination would be met, with the burden shifting to the defendant to show why the physical characteristic was job-related.

Similarly, the statistical disparity here between male and female performance on the physical agility test establishes the *prima facie* case of sex discrimination, with the burden shifting to the defendants to show that the selection device is job-related. If defendants establish to the court's satisfaction that the upper body strength which the test primarily measures is necessary to patrol work, they will prevail, not because the plaintiffs have not established the *prima facie* case, but because the necessity for proper job performance of the skills measured by the selection device permits use of the device despite its adverse impact. Defendants' argument errs in that it takes as given the precise fact that the law requires defendants to prove.

1764, 36 L.Ed.2d 583 (1973), sex discrimination is proscribed by Title VII, 42 U.S.C. § 2000e–2. Courts faced with equal protection challenges to public employment examinations have generally granted persuasive force to cases under Title VII and the E.E.O.C. Guidelines. See the discussion and authority cited in the prior Memorandum of Decision in this case, 371 F.Supp. at 1336.

Even if the device is job-related, it must additionally be shown that there are no acceptable alternative practices which could accomplish the same purposes with lesser adverse impact. As the court stated in Robinson v. Lorillard Corporation, 444 F.2d 791, 798 (4th Cir. 1971):

> The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact. (Footnotes omitted.)

The guidelines of the Equal Employment Opportunity Commission, § 1607.3, Discrimination defined, 29 C.F.R. § 1607.3, set out the defendants' burden:

> The use of any test which adversely affects hiring, promotion, transfer or any other employment or membership opportunity of classes protected by Title VII constitutes discrimination unless: (a) the test has been validated and evidences a high degree of utility as hereinafter described, and (b) the person giving or acting upon the results of the particular test can demonstrate that alternative suitable hiring, transfer or promotion procedures are unavailable for his use.

The defendants' burden is particularly heavy here because San Francisco desires to become the only major city in the nation using a ratable physical agility examination to select its patrol officers. Evidence presented to the court indicates that all of the other major police forces in the nation have either a pass/fail physical examination or no pre-selection physical agility requirement whatsoever, relying on academy training to develop the physical condition of the officers as the armed services treat new recruits in basic training.

Defendants contend that the evidence submitted demonstrates that the San Francisco physical agility test is a "validated" selection device as that term is understood under the Civil Rights Statutes, 42 U.S.C. §§ 1981 and 1983, 2000e et seq., and the Guidelines of the Equal Employment Opportunity Commission. Empirical evidence of the test's validity with respect to women is not available since no females are on the patrol force. Their performance on the job cannot, therefore, be compared to their performance on the challenged selection device. Defendants contend, however, that the examination is proper under theories of content or construct validity. See E.E.O.C. Guideline 1607.5(a), Minimum standards for validation, 29 C.F.R. § 1607.5(a).

The job analysis that formed the basis for the examination was performed by Dr. Frank Verducci of San Francisco State University. Defendants contend that the analysis was thorough and forms the basis for a valid selection device. Dr. Verducci interviewed police officers, observed officers on patrol and distributed questionaires to a number of officers. From the data he collected, he constructed a model of the physical skills which officers encountered in emergency situations. He then selected test events that would measure those skills, choosing and giving variable weight to the events in consultation with kinesiologists in an attempt to match

as closely as possible the muscle group functions measured by the examination with those actually used by officers in emergency situations. Defendants contend that the job analysis was thorough and that the resultant examination is sufficiently valid to justify the extreme adverse impact it has on female applicants.

Plaintiffs contend that the physical agility test is invalid because the job analysis was careless, the test is not job-related, the test is not designed to have the least adverse impact against women and because present patrol officers were not required to meet the same standards that defendants seek to apply to women applicants.

A job analysis must be careful in order to support the validity of a test based on that analysis. E.E.O.C. Guideline 1607.5(b), 29 C.F.R. § 1607.5(b). Dr. Verducci based his job analysis primarily on responses by police officers to his questionaires. Three hundred fifty questionaires were distributed to officers in a manner that did not purport to be random or based on any established sampling technique. Only approximately 150 questionaires were returned, with no apparent check on whether an individual officer completed more than one questionaire. Affidavit of Edward L. Epting. Upon receipt and examination of the questionaires, Dr. Verducci disregarded the answers to questions 3 and 4 because he thought them unreliable, leaving only the answers to questions 1 and 2 as the primary foundation of the job analysis. No consideration was apparently given to the possibility that, since so many officers failed to comprehend questions 3 and 4, they may also have misunderstood questions 1 and 2. With the assistance of an unskilled and only minimally trained secretary, Dr. Verducci then sorted the answers, disregarding those which he considered not to have been made in a serious vein, and categorizing the remainder according to the primary skill used. With the assistance of kinesiologists using a crude

(0, 1, 2) scale to rate muscle group function and Officer Mollo, the San Francisco Police Department training officer, simulating the physical acts, Dr. Verducci selected and weighted the various test items.

A selection device which has an adverse impact against women can only be used if it is job-related, that is, if it measures skills necessary to perform patrol work. The San Francisco physical agility test was designed only to measure those physical skills used in emergency situations. In sifting the questionaire responses, Dr. Verducci disregarded those answers which did not emphasize the physical aspects of patrol work or which emphasized other skills such as teamwork, intelligence, judgment, patience, and verbal skills as more important aids to patrol officers in emergency situations. The ultimate test devised places primary emphasis on strength, in particular upper body strength, by its reliance on the dynamometer, elbow flexion, and shoulder flexion, which together constitute more than half of the test.

In light of the problems with the job analysis performed and the inconclusive evidence on the extent to which the skills measured by the test are related to patrol performance, this court is of the opinion that the validity of the selection device has not been established. The almost total adverse impact against women compels this court to require a very high degree of persuasion from the defendants before the test can be used as a selection device. The manner in which defendants intended to use the test would have given it disproportionate importance because the distribution of scores on the physical examination is so much more widely dispersed than the distribution of written examination scores. Even if the test were found to be valid, there has been no showing by the defendants that there are no alternative means of selecting for the desired skills that would have a lesser adverse impact against women. Furthermore, women, as members of a group that was

discriminated against by defendants in the past, cannot be measured by a device more demanding than those given to past or present patrol officers. Section 1607.11 of the E.E.O.C. Guidelines, Disparate treatment, 29 C.F.R. § 1607.11 reads:

> The principle of disparate or unequal treatment must be distinguished from the concepts of test validation. A test or other employee selection standard—even though validated against job performance in accordance with the guidelines in this part—cannot be imposed upon any individual or class protected by Title VII where other employees, applicants or members have not been subjected to that standard. Disparate treatment, for example, occurs where members of a minority or sex group have been denied the same employment, promotion, transfer or membership opportunities as have been made available to other employees or applicants. Those employees or applicants who have been denied equal treatment, because of prior discriminatory practices or policies, must at least be afforded the same opportunities as had existed for other employees or applicants during the period of discrimination. Thus, no new test or other employee selection standard can be imposed upon a class of individuals protected by Title VII who, but for prior discrimination, would have been granted the opportunity to qualify under less stringent selection standards previously in force.

The results of administering the test to present patrol officers provide some evidence of how present officers would have fared if this examination had been an entrance requirement for them, but the methodology does not meet the standard of a concurrent validity study. Pursuant to direction of this court, 100 present patrol officers were to take the San Francisco physical agility test. Sixty-five officers completed the test with scores comparable to those of male applicants. However, no attempt was made to correlate their scores on the physical agility test with their ratings as patrol officers in order to determine the extent to which performance on the test predicted job performance. Furthermore, no explanation was ever presented to the court indicating why only 65 officers completed the test or how those officers differed, if at all, from the 35 who were chosen but did not complete the examination.

This court regards defendants' efforts at validating this examination as substantial, though not sufficient to sustain its use in light of the almost total adverse impact against women. The New York City physical agility test has a less severe adverse impact against women. Ninety-nine women succeeded on that pass/fail test at the standard used for admission to the New York City patrol force. However, this court finds it inappropriate to use that test since no evidence of its validity has been presented. See E.E.O.C. Guideline 1607.8(a), 29 C.F.R. § 1607.8(a). The court is additionally unwilling, in light of the state of the record and the serious attempt to validate the examination, to order 50% quota hiring of females as was done in Schaeffer v. Tannian, 394 F.Supp. 1128 (E.D.Mich.1974).

The most direct course for this court to take would be to enjoin use of the physical agility test to select women because of the adverse impact and the insufficient showing of validity. This would require defendants to select women patrol officers without a pre-selection physical agility test or to devise a new, nondiscriminatory test. In order not to prejudice the female applicants by permitting males to be hired sooner, the court would be required to continue the injunction against hiring until the new test was devised, validated and administered to the applicants. This would be unacceptable in light of the immediate hiring needs of the San Francisco Police Department.

On the present state of the record, a middle course seems preferable. De-

fendants have proposed an experimental program placing women on patrol in the San Francisco Police Department. The performance of these female officers would then be studied over the period during which this list is in effect, thereby both introducing women to patrol work in San Francisco and providing information that can be used to prove the validity or invalidity of the physical agility test at issue. Evidence before this court indicates that women have been used in police patrol work in substantial numbers nationwide, most notably in Washington D. C. and New York City, and locally, in the California Highway Patrol, as well as in a large number of California city police departments and county sheriff's offices. An initial group of 60 female patrol officers would seem appropriate. This number, while relatively small when compared to the number of men that will be appointed and the number of male officers already on the force, is sufficiently large to permit a study to be made and to provide the women with mutual support.

The method of choosing the women to be appointed presents difficulties. The defendants have scored the physical agility test by the multiple hurdle method, under which failure on any single item disqualifies an individual on the entire test. The items that contribute most to the exclusion of women are the wall and sandbag, with the sandbag by far the most serious. Dr. Verducci attempted to develop a correlation between ability to lift the sandbag and ability to hold a simulated suspect. While there is a correlation, the evidence was not conclusive since a number of persons were able to successfully hold a suspect, yet unable to hold the sandbag. Since the sandbag has the most adverse impact against women, this court will not permit its use as a disqualifier of female applicants.

At a normalized T-score of 37, comparing women to women, a pool of 84 women will be available for appointment. Any qualified woman applicant appointed to the Police Academy who is terminated during the training or the probationary period, for any reason, or who voluntarily terminates her employment, shall be replaced by another qualified woman applicant. If, because of attrition, 84 is not a sufficiently large pool to result in the placing of 60 female patrol officers, the other 14 women at a T-score of 37, who passed neither the sandbag nor the wall, may enter the Academy, but they will be required to scale the wall prior to graduation.

The evidence indicates that defendants will be training forty persons in each academy class with two classes proceeding simultaneously for 16 weeks. The court hereby directs that 15 of the 40 persons in each of the first four academy classes be women, thereby insuring that the 60 female officers will be on patrol within 32 weeks.

## HIRING OF MALE MINORITY GROUP APPLICANTS

Since the written and physical agility tests have had only minimal disproportionate impact against male members of minority ethnic groups, the only question remaining for present resolution by this court is the manner by which these applicants will be appointed as officers. This court, in its Memorandum of Decision, filed on November 26, 1973, found that defendants' previous hiring practices discriminated on the basis of race against plaintiffs and the individuals they represent. The court enjoined defendants from using the entry-level admission examination and the promotion-level sergeant examination and suggested that accelerated hiring of minority group males to positions as Q–2 patrol officers would be an appropriate remedy in this case. Plaintiffs now urge this court to formalize a quota-hiring order. Defendants and intervenors vigorously oppose this form of relief.

Presently there are roughly 160 vacancies on the police force. The final list formulated by the Civil Service Commis-

sion is expected to include enough individuals to fill the appointment needs of the San Francisco Police Department for between two and two-and-a-half years. The percentage of minority group applicants at any possible cutoff point on the present ranked list is between 38 and 39 percent. Plaintiffs urge the court to accelerate the appointment of minorities from the list to permit them to begin and complete academy training and begin actual patrol work sooner than if they were hired in the order of their rank on the list. If this were done, during the latter part of the list period, Whites only would remain eligible and be appointed until the list was exhausted.

■ Given the large number of patrol officers that will be promptly appointed and the relatively short period during which hiring will be done from the present list, this court is of the opinion that accelerated hiring of male minority group applicants is not now necessary in this case. Such an order would tend in some degree to remove the present continuing effects of defendants' past unlawful practices which resulted in the disproportionate exclusion of ethnic minorities from the police force. However, representatives of the various ethnic groups that comprise the San Francisco community are quite evenly dispersed throughout the present list. Hiring directly from the list of eligibles, in rank order, will treat everyone equally, regardless of race or ethnic origin, thereby facilitating acceptance of the new officers by the San Francisco Police and Civil Service Commissions, the administration of the San Francisco Police Department, and their colleagues presently on the police force.

By declining to accelerate the hiring of male minorities in this case, the court does not intend to comment adversely on the constitutionality or propriety of such remedies in other factual contexts. San Francisco is a unique cosmopolitan city for many reasons, perhaps the most important of which is the fascinating and challenging breadth of ethnic backgrounds of its citizens. This court is of the opinion that direct hiring of male officers in order of their rank on the eligibility list will hasten community acceptance of a law enforcement force that reflects that ethnic diversity.

## CONCLUSION

The physical agility test has no appreciable adverse impact against male members of ethnic minority groups and, consequently, is not formally subject to challenge by those persons. However, in the interest of fairness, this court is of the opinion that the men should be treated the same as the women. Accordingly, the 594 men at a normalized T-score of 37, comparing men to men, will be eligible for appointment. As with the women, this includes those individuals disqualified by the sandbag portion of the test. The weight to be accorded the physical agility test in preparing the final lists of eligible male and female applicants may remain at 35% or any lesser percentage which is chosen by the defendant Civil Service Commission.

The evidence indicates that the normal attrition rate between eligibility and actual appointment is aproximately 30%. At a T-score of 37 as directed by the court, the number of eligible males will likely result in slightly over 400 males being appointed from the list. When this figure is added to the 60 female patrol officers, the present list should serve the needs of the department for between two and three years.

This court will retain jurisdiction of the case to remedy any possible disproportionate impact that might result from the oral examination, the background check, the Police Academy training, and the probationary period.

The defendant Civil Service Commission is hereby directed to present this court with a completed list of eligible candidates, prepared in accordance with the directions in this opinion, at 10:00 a. m., on Friday, May 16, 1975. The list shall be provided to plaintiffs' counsel by

noon on Thursday, May 15, 1975. Counsel are hereby directed to consult with one another and be prepared at the time the final list is presented to discuss the specific manner by which the study of female patrol officers is to be conducted and the safeguards that will be necessary to provide a climate conducive to the success of women in patrol work.

It is so ordered.