WISCONSIN NATIONAL ORGANIZATION FOR WOMEN, Gloria J. Ziegler, individually and on behalf of all others similarly situated, Plaintiffs,

v.

STATE OF WISCONSIN et al., Defendants.

No. 75–C–392.

United States District Court, W. D. Wisconsin.

July 30, 1976.

Gretchen T. Vetzner, Madison, Wis., for plaintiffs.

Bronson C. LaFollette, Atty. Gen., State of Wis., by David C. Rice, Asst. Atty. Gen., Madison, Wis., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is a civil action in which plaintiffs challenge defendants' employee merit pay plan on statutory and constitutional grounds. Jurisdiction is asserted under 28 U.S.C. § 1343 and 42 U.S.C. §§ 2000e et seq. Defendants have moved for summary judgment.

Based on the record, including the stipulation of facts submitted by the parties, I find that there is no genuine issue as to the material facts set forth hereinafter under the heading "Facts."

### Facts

Plaintiff Wisconsin National Organization for Women (N.O.W.) is an association which has as a purpose the promulgation of the equal treatment of women and men in employment. Plaintiff Ziegler is a female employee of the defendant State of Wisconsin. She is presently classified in pay schedule 2, which schedule includes clerical and related employees. The pay range in pay schedule 2 is from $483 to $1,258 per month.

Effective July 6, 1975 defendant State of Wisconsin and its officials implemented a new merit system for nonrepresented state employees. Under this plan, state employees in pay schedules 2 and 16 are eligible to receive on a pass-fail basis a Sustained Performance Award (SPA) of 1½% of base pay merit increase during the first year of the biennium and 1% the second year. Pay Schedule 16 employees are classified as "Non-Professional Supervisory and Non-Professional Confidential Employees." The pay range in Schedule 16 is from $454 to $1,258 per month.

Under the new merit plan, employees in pay schedules 1 and 7 are eligible to receive from 0 to 10% merit increase (Discretionary Performance Award, DPA). Employees in pay schedule 1 are classified as "Professional, Supervisory, Management or Confidential Employees" and the pay range is from $768 to $2,946 per month. Employees in pay schedule 7 are classified as "Fiscal and Staff Services" and the pay range for non-trainees in this schedule is from $719 to $2,087 per month.

Of the 4983 employees in pay schedules 1 and 7, 80.09% are male and 19.91% are female; 97.43% are white and 2.57% are non-white. Of the 11565 employees in pay schedules 2 and 16, 21.27% are males and 78.73% are females; 95.4% are white and 4.51% are non-white.

Of all the women employed in pay schedules 1, 7, 2, and 16, approximately 90% are employed in schedules 2 and 16. Of all the minority persons employed in those four pay schedules, approximately 80% are employed in pay schedules 2 and 16.

Over 90% of persons employed by the State as clericals are women.

No employee at the top of his or her salary range may receive an S.P.A. or D.P.A., although 1½% of the base pay of such employees is calculated in determining the size of the merit fund. Approximately 29% of clericals are ineligible to receive S.P.A.'s. Approximately 14% of professionals are ineligible to receive D.P.A.'s.

If an employee fails to receive an S.P.A. award for two consecutive years, some sort of remedial action must be taken on the part of the employer to correct the employee's or supervisor's deficiencies. There is no analogous requirement for employees failing to receive D.P.A.'s.

The size of the merit fund is determined by the total of 1½% of the base pay of every eligible employee. Merit money left over after S.P.A.'s have been awarded may be used to augment D.P.A. awards. D.P.A. money cannot be used for S.P.A.'s. Thirteen state agencies used clerical-originated merit funds to increase the amounts awarded to professionals as D.P.A.'s.

Twenty-eight state agencies expended a greater percentage of merit money on professionals than on clericals. Out of the merit funds generated by employees in Schedules 2 and 16, 68.9% was awarded as S.P.A.'s. Out of the merit fund generated by employees in pay schedules 1 and 7, 93.5% was awarded as D.P.A.'s. The average per capita merit award for the clerical group is $88.93 if all employees are included and $124.71 if only eligible employees receiving a "Pass" are included. The average per capita merit award for the professional group is $232.64 if all employees are included and $292.65 if only eligible persons receiving an award are included.

Equity awards (E.A.'s) may be granted from merit funds left over from the S.P.A. and D.P.A. funds to persons to resolve pay inequities due to pay adjustments to bargaining unit employees, achievement of additional job related training, or internal alignment based on other classification actions.

A total of 51 equity awards were distributed, 11 to employees in pay schedules 1 and 7 and 40 to employees in pay schedules 2 and 16.

Twenty-nine of the equity awards were given to eliminate inequities in salaries in relation to other employees or to make adjustments needed because of other classification actions. Twenty-two of these were given to employees in 2 and 16 and seven to employees in 1 and 7. Seven awards were given to employees for taking on additional duties and responsibilities or for high achievement; three of these went to employees in 2 and 16 and four to employees in 1 and 7. Fifteen equity awards were given to adjust the salaries of non-represented employees in relation to represented employees; all of these went to employees in schedules 2 and 16.

Exceptional Performance Awards may be granted from merit funds left over after S.P.A.'s, D.P.A.'s, and E.A.'s have been granted.

### Opinion

I note initially that although this action was filed on behalf of a class consisting of women and minorities adversely affected by the challenged practices, a class has not yet been certified. However, because certification of a class will not affect the disposition of this motion, I find it proper to decide this motion without first determining whether this action should proceed as a class action.

### § 1981

The Court of Appeals for the Seventh Circuit has recently indicated its approval of the long line of cases holding that § 1981 does not provide jurisdiction where sex discrimination is alleged, *Jenkins v. Blue Cross Mutual Hospital, Ins. Inc.,* 522 F.2d 1235 (7th Cir. 1975), and I am bound to follow this ruling. Plaintiff Ziegler is a female; plaintiff N.O.W. is an organization, the purpose of which is to bring about equal treatment between men and women in employment. There is nothing on the record from which I could find that plaintiff Ziegler is a member of a racial minority group or that plaintiff N.O.W. was organized for

the purpose of representing the interests of such groups as well as women.

■ But plaintiffs argue that it is permissible for them to assert the interests of racial minorities and therefore jurisdiction exists under § 1981. In all the cases cited by plaintiff in support of this position, jurisdiction is predicated upon Title VII and the issue is whether the named plaintiffs were proper representatives of the class they sought to represent.[1] In none of the cases was there any question as to whether the named plaintiffs had standing to assert the claims they were advancing on their own behalf.

Nor does *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), also cited by plaintiffs, support their position. The white plaintiff in that case was held to have standing to challenge the exclusion of blacks from the juries indicting and convicting him because the selection of a jury in an arbitrary and discriminatory manner was held to cast doubt on the fairness of the whole judicial process, thereby violating his right to due process. He was not seeking, as plaintiffs attempt to do under § 1981, to assert the rights of black persons.

There are exceptional circumstances in which a plaintiff has standing to assert the rights of persons not before the court. *See*

*Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). But plaintiffs have not demonstrated the existence of such circumstances.

I conclude that this court does not have jurisdiction under 42 U.S.C. § 1981.[2]

*Title VII, 42 U.S.C. § 2000e* [3]

■ Plaintiffs' brief suggests that they understand the complaint to raise issues concerning defendants' hiring, promotion, and training practices. However, the complaint does not allege any discriminatory practice, act, or effect in these areas; rather it alleges numerous ways in which the merit plan has a discriminatory impact on women and minorities. The complaint does allege a statistical imbalance of women and minorities in various salary ranges, which allegation is essential to plaintiff's claim that the merit system has a discriminatory impact. It is true that where a plaintiff alleges that he or she has been discriminated against by either being denied a job or a promotion or by being hired for one job as opposed to another, the statistical make-up of the employee's work force has been held to be evidence, having varying degrees of weight,[4] of discrimination. However, it does not follow, and I decline so to hold, that an allegation of racial and sexual im-

1. In *Harvey v. International Harvester Co.*, 56 F.R.D. 47 (N.D.Cal.1972), the court held that a member of one minority group could represent a class consisting of other minority groups affected by the discriminatory policies of the employer. In *Barnett v. W. T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975), *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir. 1969), and *Hicks v. Crown Zellerbach Corp.*, 49 F.R.D. 184, 188 (E.D.La.1967), the courts held that black employees who had experienced one kind of discriminatory act could represent a class consisting of black employees who had experienced other kinds of discriminatory acts by the same employer.

2. My conclusion that plaintiffs do not have standing under § 1981 would not be affected by a determination of the class action issue. Rather, one of the threshold requirements for plaintiffs to represent a class of persons under § 1981 would be that plaintiffs have standing under that statute.

3. The original complaint did not allege that plaintiff had filed a charge with the E.E.O.C.

Commission and that she had received from them notice of her right to sue. Since that time, a supplemental complaint which does so allege has been filed, along with a "Notice of Motion and Motion for Leave to File Supplemental Complaint"; copies of the charge and notice are attached thereto. The record reveals that defendants have agreed by stipulation that plaintiffs should be permitted to supplement the complaint. I conclude that under *Gibson v. Kroger*, 506 F.2d 647, 652 (7th Cir. 1974), it is permissible to grant plaintiffs' motion, and that the jurisdictional defects of the original complaint are thereby cured.

4. Compare: *Motorola, Inc. v. McLain*, 484 F.2d 1339 (7th Cir. 1973); *Parham v. Southwestern Telephone Co.*, 433 F.2d 421 (8th Cir. 1970); *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40 (5th Cir. 1974); *Badillo v. Dallas County*, 394 F.Supp. 694 (N.D.Tex.1975); *Wetzel v. Liberty Mutual Ins. Co.*, 372 F.Supp. 1146 (W.D.Pa.1974).

balance is sufficient to state a claim for relief from discriminatory hiring and promotion practices in the absence of any allegation that plaintiff, or a member of the class she purports to represent,[5] was in some way discriminated against in regard to hiring and promotion.

An additional consideration is that one of the primary functions of the complaint under the Federal Rules of Civil Procedure is to give the party being sued notice of the claims asserted against him or her. I do not believe that this complaint can be fairly said to give defendants notice that its hiring and promotion practices are being challenged.

I consider that the complaint can be fairly said to raise the following issues under Title VII:[6] (1) Given the greater concentration of women in schedules 2 and 16, does the difference in treatment under the new merit plan of employees in schedules 1 and 7 constitute discrimination based on sex? (2) Given the greater concentration of women in schedules 2 and 16, does the granting of Equity Awards for the purposes of raising pay because of job training and equalizing pay with represented employees result in a disproportionate number going to employees in schedules 1 and 7 and, if so, does this constitute discrimination based on sex? (3) Does the predominance of white male supervisors, in conjunction with the amount of discretion supervisors have in evaluating employees for Exceptional Performance Awards, constitute discrimination based on sex?

As to the first issue, I conclude that there are no material facts in dispute. It is clear that the merit plan results in employees in schedules 1 and 7 receiving higher merit pay increases than employees in schedules 2 and 16.[7] It is also clear that on its face the merit plan does not distinguish between employees on the basis of sex.

42 U.S.C. § 2000e–2(h), Section 703(h) of Title VII, provides in part:

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . . .

It is not clear from the language of this subsection what constitutes *bona fides* in a merit plan. I therefore look to the legislative history.

The initial bill reported by the House Judiciary Committee as H.R. 7152[8] and passed by the House on February 10, 1964 did not contain 703(h). After debate in the Senate concerning the effect of the proposed bill on seniority, a substitute bill containing the above quoted part of 703(h) was introduced by Senators Mansfield and Dirksen.[9] This substitute bill, and hence

---

5. It may be that a plaintiff who has been affected by a particular discriminatory practice can represent a class consisting of persons who have experienced other discriminatory practices by the same employer, which practices the named plaintiff has not experienced. *See Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir. 1969).

6. Because this action has not been certified as a class action, and because plaintiff is not a member of a racial minority, I will consider her claims only insofar as they assert discrimination based on sex. The method of analysis and the result would not differ were I also to consider the effect of defendants' practices on racial minorities.

7. Plaintiff appears to attach significance to the fact that funds "generated" by employees in 2 and 16 may be used to award D.P.A.'s. As I see it, this practice is relevant only in that it enables employees in 1 and 7 to receive higher merit increases than employees in 2 and 16. Certainly the funds "generated" by employees cannot be said to "belong" to them.

8. See H.R.Rep.No.914, 88th Cong., 1st Sess. (1963), U.S.Code Cong. & Admin.News 1964, p. 2391.

9. 110 Cong.Rec. 11,926, 11,931 (1964).

703(h), was not the subject of a committee report.[10] However, during debate on the substitute, Senator Humphrey, who had participated in the informal conference resulting in the substitute, made these statements in explaining 703(h):

"For example, if an employer has plants in different locations, and one of the plants employs substantially more Negroes than the other, it is not unlawful discrimination if the pay, conditions, or facilities are better at one plant than at the other unless it is shown that the employer was intending to discriminate for or against one of the racial groups." [11]

In the light of this remark, I interpret 703(h) to say that the fact that a merit plan, neutral on its face, adversely affects a disproportionate number of women does not in itself render the merit plan discriminatory or not *bona fide*.

■ Plaintiff urges the application of theories developed by courts in cases dealing with practices other than merit plans. First, plaintiff urges this court to apply the "disparate impact" theory of *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). That case holds that where a facially neutral educational or test requirement excludes a disproportionate number of blacks from a job, it must be shown to be related to ability to perform the job in order to withstand attack. Other courts have applied this same theory to invalidate height requirements,[12] weight requirements,[13] and the use of arrest records [14]—in short, practices which have

the effect of excluding women or racial minorities from employment opportunities. In light of 703(h) as I have construed it, I conclude that the "disparate impact" theory should not be extended to test the validity of a facially neutral merit pay plan which clearly does not have the effect of excluding any class or persons from employment opportunities.

Plaintiffs advance another theory, this one developed in cases dealing with seniority systems. Courts have found departmental seniority systems to be unlawful where, although they are neutral on their face, they perpetuate the effects of pre-Act discrimination hiring and cannot be shown to be necessary to the business. *Local 189, United Papermakers v. United States*, 416 F.2d 980 (5th Cir. 1969); *Quarles v. Phillip Morris, Inc.*, 279 F.Supp. 505 (D.C.Va.1968).[15] I note that this same theory has recently been applied by the Seventh Circuit to a situation in which a woman, who had been discriminatorily fired after the effective date of the Act and then later rehired, had her seniority dated from the rehiring rather than the initial hiring. *Evans v. United Airlines*, 534 F.2d 1247 (7th Cir. 1976). The court held that the application to her of the "continuous time in service" seniority rule was discriminatory because even though the rule was facially neutral it adversely affected her as a result of the prior discriminatory act.

A crucial element in both *Evans* and the cases cited by plaintiffs is a prior discriminatory act or practice which has ceased.[16]

---

10. Vass, *Title VII: Legislative History,* 7 B.C. Ind. & Com.L.Rev. 431, 445 (1966).

11. 110 Cong.Rec. 12,723 (1964).

12. *Officers for Justice v. Civil Service Commission of City and County of San Francisco,* 395 F.Supp. 378 (D.C.Cal.1975).

13. *Meadows v. Ford Motor Co.,* 62 F.R.D. 98 (D.C.Ky.1974), modified on other grounds, 510 F.2d 939.

14. *Gregory v. Litton Systems, Inc.,* 316 F.Supp. 401 (C.D.Cal.1970), modified on other grounds, 472 F.2d 631.

15. The Seventh Circuit in *Waters v. Wisconsin Steel Workers of International Harvester Com-*

*pany,* 502 F.2d 1309 (1974) declined to apply this theory to invalidate an employment seniority system as did the Fifth Circuit in *Watkins v. Steelworkers Local 2369,* 516 F.2d 41 (1975).

16. It is true that in *Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), cited by plaintiff, the employee's discriminatory hiring practices were still in effect; however, it was those practices which were being challenged, and not the seniority system. The only issue in regard to seniority was whether an award of retroactive seniority was appropriate relief for the discriminatory hiring.

As I have already discussed, this complaint does not allege discrimination in hiring, either past or present. I therefore need not decide whether, if the complaint did so allege, and if plaintiff could so prove, the analysis applied to facially neutral seniority systems which continue the effects of past discrimination should be applied to a facially neutral merit pay plan of the sort challenged here.

Concerning the issue of the allocation of equity awards, the material and undisputed fact is that approximately 20% of the equity awards went to employees in schedules 1 and 7, who make up 31% of the total employees. Thus, a disproportionately high number of equity awards did not go to employees in those pay schedules.

■ In their brief, plaintiffs assert other grounds for the contention that the distribution of equity awards "may be discriminatory." None of these appears in the complaint or an amendment thereto. Plaintiffs should not be permitted to speculate as to possible grounds for declaring the distribution discriminatory if the ground alleged in the complaint fails. Moreover, plaintiffs stipulated to the truth of the reasons given for the granting of the equity awards, and those reasons are neutral with regard to sex and race.

■ On the basis of the present record I am unable to find facts either supporting or refuting the allegations in the complaint that supervisory personnel have great discretion in awarding E.P.A.'s and are predominately white male. However, even if I assume these allegations to be fact, I conclude that they do not entitle plaintiff to relief.

In *Rowe v. General Motors Corporation,* 457 F.2d 348 (5th Cir. 1972), the court found discriminatory promotion procedures which excluded a disproportionately large number of blacks and utilized vague and subjective criteria which were applied by white foremen. The complaint in this action does not allege that any E.P.A.'s have actually been awarded to anyone;[17] rather, plaintiffs' claim appears to be that an award system in which supervisors who are predominately white male have discretion in granting the awards is *per se* discriminatory. *Rowe* clearly does not stand for such a proposition, since in that case there was evidence that the promotion system in fact operated to exclude a disproportionate number of blacks, including the plaintiffs, from promotion. In the absence of an allegation of a past pattern of awarding E.P.A.'s to a disproportionate number of white males or of any threat or indication that they will be so awarded, I conclude that plaintiffs have not stated a claim which, if proved, would entitle them to relief on this issue.

## § 1983—Fourteenth Amendment

■ The equal protection clause of the Fourteenth Amendment prohibits states from treating one class of persons differently from another class unless the differential in treatment is justified according to the applicable standard. Plaintiffs take the position that the relevant classification for the purposes of this action is based on sex and race. However, I am persuaded that the relevant classification is as between employees in pay schedules 2 and 16 versus employees in pay schedules 1 and 7. I reach this conclusion in part based on the opinion in *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1973). In that case, plaintiffs challenged a disability insurance plan which excluded from its coverage disabilities due to pregnancy. The court rejected the argument that the classification was sex-based; it noted that even though only women belonged to the class of pregnant employees, both men and women belonged to the class of non-pregnant employees (footnote 20, p. 496–7). In the instant case, both men and women are employed in schedules 2 and 16 and in 1 and 7.

■ I also find relevant a more recent Supreme Court case, *Washington v. Davis,*

17. It appears from defendants' answer to # 12 of plaintiffs' first set of interrogatories that none has been awarded.

—— U.S. ——, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). In that case the plaintiff challenged on equal protection grounds a qualifying test for a job which excluded a disproportionate number of blacks. The Court of Appeals had found the test discriminatory, applying the *Griggs* rule. The Supreme Court declined to use the standards developed under Title VII for the purposes of determining whether there was racial discrimination under the Constitution. Rather, it held that a neutral law, serving ends otherwise within the government's power, is not invalid under the equal protection clause simply because it burdens one race more than another and cannot be justified by a compelling state interest. While the opinion is primarily formulated in terms of the proper test for racial discrimination under the equal protection clause, I believe it also stands for the proposition that a facially neutral classification cannot be considered race-based simply because the classification affects races disproportionately.

■ The appropriate standard for review of the merit plan, then is whether the different treatment of employees in 2 and 16 as compared to employees in 1 and 7 is rationally related to a legitimate state purpose.

Defendants assert that the difference in treatment is justified by the different nature of the jobs performed in the two classifications; specifically that the nature of clerical and related work is such that the range between poor and excellent performance of the work is not as great as the range between poor and excellent performance by professionals whose work involves a greater variety of skills. Defendants assert that because of the difference in the nature of the work performed by the two groups of employees, the difference in treatment has a substantial relation to the legitimate state purpose of recognizing and encouraging meritorious service through pay increases.

■ Clearly the objective the merit system purports to serve is legitimately within the power of the state. And I cannot say that a merit system which allows for greater merit increases and a wider range of increase to persons performing professional jobs than to persons performing clerical jobs is not rationally related to that purpose. Just as the state may legitimately decide to pay employees at different rates depending on the skills and training involved in their jobs, it may also legitimately decide to recognize meritorious performance at different rates depending on the nature of the job performed. The precise merit increase appropriate for one job as opposed to another is not a question for this court to decide.

The new merit system does not distinguish between employees in schedules 2 and 16 and those in schedules 1 and 7 for the purposes of granting equity awards and exceptional performance awards. As to equity awards, distinctions made are between employees who have received additional job training and those who have not; employees whose counterparts are represented and those whose counterparts are not; employees who have assumed additional responsibilities and those who have not; and employees who are not receiving the appropriate pay for their job classification and those who are. I conclude that none of these distinctions offends the equal protection clause. I reach the same conclusion as to the distinction made in the granting of E.P. A.'s between employees judged to have excellent performances and those not so judged.

### Order

It is hereby ordered that plaintiffs' motion to supplement the complaint is granted; and defendants' motion for summary judgment is granted.