Fanchon BLAKE et al., Plaintiffs,

v.

CITY OF LOS ANGELES et al., Defendants.

No. CV 73–1962–JWC.

United States District Court, C. D. California.

May 13, 1977.

Timothy B. Flynn, A. Thomas Hunt and Mary-Lynne Fisher, Center for Law in the Public Interest, Jill Jakes, ACLU Foundation of Southern California, Los Angeles, Cal., for plaintiffs.

Burt Pines, City Atty., John B. Rice, Senior Asst. City Atty., Cecil W. Marr and Robert J. Loew, Deputy City Attys., Los Angeles, Cal., for defendants.

Dale B. Goldfarb and George J. Franscell, Dryden, Harrington & Swartz, Los Angeles, Cal., for intervenor.

CURTIS, District Judge.

This class action is an across-the-board attack on alleged sexually discriminatory practices of the City of Los Angeles in the operation of its Police Department. Jurisdiction is claimed under 28 U.S.C. § 1343(3) and (4). The action is brought under 42 U.S.C. § 1983, the Fourteenth Amendment of the United States Constitution, and Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, et seq.).

The challenged practices have occurred over a time span embracing three different periods; each period brings into play different considerations and different standards of review.

The first relevant period was that prior to March 24, 1972, the date upon which Title VII was made applicable to "governments, governmental agencies [and] political subdivisions." During this period, the City maintained two separate employment classifications for its sworn police officers, "Policemen" and "Policewomen".

The second relevant period runs from the Title VII effective date of March 24, 1972 until June 1973, when the City of Los Angeles put into effect a new hiring system. The City continued the dual system of Policemen and Policewomen during this fifteen month period.

The third period commences in June 1973, when the City attempted to comply with Title VII. Under the new hiring system, the gender-based classifications were abandoned and the single position of sworn "Police Officer" was established. As a part of the new procedure, the City also established candidate selection criteria and policies relating to promotions, pay grades, transfers, retirement, and pension benefits. Although the new policies were not based on gender, they resulted in a statistically greater impact on women than men.

The defendants have moved for summary judgment. In support of their respective positions upon the issues raised by the motion, the parties have furnished the court with voluminous affidavits and a vast amount of statistical data. In addition thereto, the parties have entered into a pretrial conference order containing a stipulation of facts, which has largely limited the factual issues and greatly facilitated a pretrial determination of the many legal questions presented by this case.

## I. STATUTE OF LIMITATIONS

As a threshold issue, the defendants have questioned the statute of limitations applicable to the claims under 42 U.S.C. § 1983. The initial complaint was filed August 20, 1973. It is well settled in California that the applicable statute of limitations for civil rights actions brought under 42 U.S.C. § 1983 is the three year statute provided in section 338(1) of the California Code of Civil Procedure. *Donovan v. Reinbold,* 433 F.2d 738, 741 (9th Cir. 1970), and *Smith v. Cremins,* 308 F.2d 187 (9th Cir. 1962). This being so, plaintiffs' claims are not barred by the applicable statute of limitations.

## II. PERIOD PRIOR TO MARCH 24, 1972

Plaintiffs' first challenge is directed to the City's employment practice for the period prior to March 24, 1972, when the City maintained the separate classifications of "Policemen" and "Policewomen". Plaintiffs urge that this classification system violated the equal protection clause of the Fourteenth Amendment. Although Police-

men and Policewomen were both sworn officers, they had different lines of promotion and different types of duties. Policemen were assigned to the more physical tasks, including work on patrol and in the field. Policewomen generally were assigned to specialized tasks and inside work.

In our approach to the question of whether these classifications comply with constitutional requirements, we must first decide what standard of review is applicable. This is a problem fraught with some confusion because of the lack of clarity in the case law.

In a "traditional" equal protection analysis, a legislative classification must be sustained unless it is patently arbitrary. *Frontiero v. Richardson,* 411 U.S. 677, 683, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). *See, Jefferson v. Hackney,* 406 U.S. 535, 546, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), and *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

The plaintiffs, however, contend that a classification based upon sex is similar to a classification based upon race, alienage, and national origin. A gender-based classification would then be inherently suspect and subjected to close judicial scrutiny.

In *Frontiero v. Richardson, supra,* the challenged statute provided that the spouse of a serviceman was deemed a dependent for purposes of obtaining certain privileges. However, the spouse of a female member of the armed services was not deemed a dependent, unless he were in fact dependent on his wife for over one-half of his support. The government admitted that the only justification for such a classification was "administrative convenience." The Court decided that a classification based upon sex could not be justified on the sole ground of "administrative convenience" and struck down the classification as being a denial of equal protection. In a plurality decision, four justices held that classifications based on sex were inherently suspect and subject to strict judicial scrutiny. 411 U.S. at 688, 93 S.Ct. 1764. Mr. Justice Stewart concurred in the result. *Id.* at 691, 93 S.Ct. 1764.

Notwithstanding *Frontiero,* a majority of the Supreme Court has not yet added sex to the list of suspect classifications. The Court has suggested, however, that a classification based upon sex will have to be justified by more than the traditional "rational" connection between the classification and some valid legislative purpose. *See, Berkelman v. San Francisco Unified School District,* 501 F.2d 1264, 1269 (9th Cir. 1974). The Court has never rejected gender as an impermissible classification in all instances. *See, e. g., Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975), and *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974).

In *Schlesinger,* the Court upheld a classification based upon sex. In that case a naval officer challenged a statutory mandatory discharge provision, which required his discharge before a similarly situated female officer would be discharged. The Court recognized the differing types of service which each sex was likely to render and upheld the classification, saying:

"In both *Reed* [*Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225] and *Frontiero* the reason asserted to justify the challenged gender-based classifications was administrative convenience, and that alone. Here, on the contrary, the operation of the statutes in question results in a flow of promotions commensurate with the Navy's current needs and serves to motivate qualified commissioned officers to so conduct themselves that they may realistically look forward to higher levels of command. This Court has recognized that 'it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise.' *Toth v. Quarles,* 350 U.S. 11, 17, [76 S.Ct. 1, 5, 100 L.Ed. 8]. See also *Orloff v. Willoughby,* 345 U.S. 83, 94, [73 S.Ct. 534, 540, 97 L.Ed. 842]. The respon-

sibility for determining how best our Armed Forces shall attend to that business rests with Congress, (citations omitted) and with the President. . . . We cannot say that, in exercising its broad constitutional power here, Congress has violated the Due Process Clause of the Fifth Amendment." 419 U.S. at 510, 95 S.Ct. at 578–79.

■ In my view, the rule governing our inquiry is set forth in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). After analyzing its recent decisions in this field, the Court stated:

"To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id.* at 197, 97 S.Ct. at 457.

This approach was reaffirmed by the Court in *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977). Under this standard of review, we must determine whether the gender-based classification in this case has a substantial relationship to the achievement of an important governmental objective.

■ The City of Los Angeles has a compelling governmental interest in providing police services to the community. As was stated in *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976):

"The promotion of safety of persons and property is unquestionably at the core of the State's police power, and virtually all state and local governments employ a uniformed police force to aid in the accomplishment of that purpose."

In assessing the relation of gender to this important governmental objective certain basic facts are apparent:

1. One of the most vital functions a municipality performs is the establishment of an effective police force to protect the lives and property of its citizens, to enforce its laws, and to preserve and maintain peace and tranquility within the community.

2. This police force must consist of Police Officers who upon an appropriate occasion have the capacity to restrain, control, subdue, arrest, or capture persons who are a threat to the community, and who are or can become aggressive, vicious or violent.

3. As defendants' affidavits clearly show and common sense confirms, physical size, strength, and agility have a direct relation to the quality of the performance of these functions. It is also important to have the kind of temperament which allows one to engage unhesitatingly in strenuous physical contact with another, whenever the occasion demands.

4. These qualities are essential to an effective, efficient, and functional police force.

■ Therefore, the only remaining question is whether a classification by gender is substantially related to the selection of Police Officers with the necessary qualities. It is not required that all men have the necessary qualities and that no women have them. There has to be only a substantial relationship between the relevant traits and gender.

■ The qualities in issue here are similar to those which prompt the selection of men for the fighting segments of our armed forces. Congress has not seen fit to draft women, and women are used in the armed forces in positions which have only an incidental relationship to actual combat. The Supreme Court has at least implicitly approved the exclusive use of men in combat positions. In *Schlesinger v. Ballard, supra,* the Court relied on this classification to justify the additional gender-based classification at issue in that case. The same factors of size, strength, and disposition which make a man a more effective combatant than a woman in the event of war, also act to make a man a better Police Officer than a woman in those areas where physical tasks are involved.

Plaintiffs have suggested that a Police Officer needs superior size and strength on relatively few occasions, compared with the

other duties an officer is called upon to perform. They therefore conclude that a gender-based classification relevant to these limited situations is not justified. It may well be true that these occasions occur relatively infrequently. But the possibility of such an occurrence exists at all times, and a city is justified in a desire to have a police department capable of exercising whatever degree of force is required, the instant it is required. Furthermore, a police force known to be capable of striking fast and hard whenever necessity demands is a strong deterrent to criminal activity. The fact that many cities have such a force is almost certainly one reason why instances of physical confrontation are so infrequent.

I conclude therefore that the evidence before this court establishes without substantial contradiction that the qualities of disposition, and physical size and strength are substantially related to the important governmental objective of providing an effective police force. I further conclude that a classification based upon gender is substantially related to and serves this important governmental objective. Therefore, the classification of Policemen and Policewomen as established by the defendants for the period prior to March 24, 1972 was valid and did not offend the equal protection clause of the Constitution.

### III. PERIOD FROM MARCH 24, 1972 TO JUNE 1973

On March 24, 1972, the provisions of Title VII were expanded to include governments, governmental agencies, and political subdivisions. Title VII subjects an alleged discriminatory classification to a more stringent judicial scrutiny than was required under an equal protection analysis.

Defendants do not claim that the dual classification system for Policemen and Policewomen in effect during this period would comply with the requirements of Title VII. Defendants contend that, irrespective of whether or not this system can withstand Title VII review, the City was justified in continuing the practice until at least June 1973, on the grounds of bona fide business necessity.

The "business necessity test" is one criteria used to determine whether a practice is unlawfully discriminatory under Title VII. This test is used because the courts recognize that the continuation of an employment practice is sometimes justified, regardless of its discriminatory impact. The court in *Robinson v. Lorillard Corporation,* 444 F.2d 791, 798 (4th Cir. 1971), stated:

"The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact."

When Title VII was first enacted, it provided for a one year grace period to allow private employers to adjust to the provisions of the Act. When it was made applicable to governments, governmental agencies, and political subdivisions, however, no such grace period was provided. Obviously, it would take some time for an agency as large as the Los Angeles Police Department to accommodate itself to the new requirements. The necessity of maintaining a functioning police department during the transition period would surely meet the test of an overriding legitimate business purpose. This necessity would justify the continuance of the employment practice for the period of time reasonably necessary to enable the City to bring itself into compliance with the Act.

The uncontradicted affidavits filed by the defendants detail the activities of those in charge of formulating and implementing the reorganization of the Department. They establish that the City made a good faith effort to comply with the Act, and

that the time required to put the revised hiring practice into effect was not unreasonable under the circumstances.

I hold therefore that during the interim period between March 24, 1972 and June 1973, defendants' hiring plan comes within the "business necessity" exemption and consequently did not violate the provisions of Title VII. I have previously concluded that this dual classification system did not violate the Fourteenth Amendment.

## IV. PERIOD SUBSEQUENT TO JUNE 1973

In June 1973, the Los Angeles Police Department was reorganized. The dual classifications of "Policewomen" and "Policemen" were abandoned, and a single classification of "Police Officer" was established without reference to sex. With the initiation of this plan, new rules and regulations were promulgated. The new policies included the establishment of certain entry-level selection standards.

Under the new system, an applicant was required to have a minimum height of 5′ 7″. The height requirement was reduced to 5′ 6″ less than a year later. An applicant was also required to pass a physical abilities examination designed to test physical endurance, strength, and agility. This test consists of five events; each event is graded on the basis of 1–100, according to the candidate's performance. The combined score on all events must equal or exceed 350. These tests are:

1. Wall scale—run a total of 50 yards then scale a smooth wall 6 feet high. (17 seconds)

2. Maintain grip—run a total of 50 yards then take an overhand grip on a chinning bar and maintain grip for one minute. (16 seconds run plus 60 seconds on the bar)

3. Weight drag—run 50 feet then drag a dead weight of 140 pounds for 50 feet. (16 seconds)

4. Tremor test—run a total of 50 yards then hold a stylus steady for 17 seconds. (17 seconds run plus 100 points on the stylus)

5. Endurance run—run as many laps as possible in 12 minutes on a one-eighth mile track. (10 laps)

(The performance in parenthesis is that which will yield the average passing score of 70 points per test.)

As might well be expected, relatively fewer women than men were able to qualify on the basis of either height or strength. Consequently, these two requirements imposed a severe adverse impact upon women.

## A. EQUAL PROTECTION REVIEW OF THE NEW REQUIREMENTS

■ After some confusion among the circuits, the Supreme Court has recently decided two cases clarifying the requirements of the Fourteenth Amendment. Under an Equal Protection analysis, an adverse statistical impact alone does not establish a prima facie case of unconstitutional discrimination. There must be additional proof of a discriminatory purpose as a motivating factor in the decision. Such a motive need not be the sole motive, or even the dominant or primary motive, but it must be one of the motives for the decision. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In *Washington,* the Court said:

"[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule, *McLaughlin v. Florida,* 379 U.S. 184, [85 S.Ct. 283, 13 L.Ed.2d 222] (1964), that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations." 426 U.S. at 242, 96 S.Ct. at 2049.

■ Since statistical impact alone is not sufficient to establish a prima facie case, and since there is no other evidence of discriminatory purpose or motive upon the record before us,[1] plaintiffs' challenge on Fourteenth Amendment grounds must fail.

## B. TITLE VII STANDARDS OF REVIEW

■ In a Title VII review, a more probing judicial inquiry is required, and the mere showing of a disproportionate impact alone has been held to establish a prima facie case. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970). However, if applying Title VII standards to local and state agencies brings into play a standard more stringent than appropriate under the Fourteenth Amendment, there would appear to be a constitutional conflict with the Tenth Amendment. Although the Supreme Court has not yet addressed itself to this issue,[2] two district courts have. *Harrington v. Vandalia-Butler Board of Education,* 418 F.Supp. 603 (S.D.Ohio, 1976), and *Scott v. City of Anniston,* 430 F.Supp. 508, (N.D.Ala.1977). The *Harrington* case applied the strict standards of *Griggs v. Duke Power Co., supra,* to state agencies.

In the *Scott* case, the court applied the rule established in *Washington v. Davis, supra,* requiring proof of a discriminatory motive or purpose. In analyzing the problem, the court in *Scott* said:

"Whether the extension of Title VII to state and local government employment means that impact will not suffice and

intent is currently the factor, is decidedly an open question. It hinges upon what Constitutional grant of power Congress has relied upon in extending the coverage of Title VII over state and local governments. If Congress is seen, as in *Fitzpatrick v. Bitzer,* 427 U.S. 445, [96 S.Ct. 2666, 49 L.Ed.2d 614] (1976), to have extended Title VII in implementation of the fourteenth amendment, no more stringent standard would be appropriate than that for which the fourteenth amendment calls, i. e., intent. If Congress is alternatively assumed to have acted in the exercise of its power to regulate interstate commerce, one comes to the Supreme Court's decision in *National League of Cities v. Usery,* 426 U.S. 833, [96 S.Ct. 2465, 49 L.Ed.2d 245] (1976), in which the Court struck down an attempt by Congress to regulate employment decisions of state and local governments under the commerce clause powers of Congress. Without the commerce clause as an appropriate alternative basis, it would appear that Congress's extension of Title VII to state and local governments cannot supplant the intent standard of *Washington v. Davis,* with the more stringent impact standard of *Griggs v. Duke Power Company, supra.*

In view of this analysis, this court believes that the intent standard, i. e., that there must be proof of discriminatory racial purpose as in *Washington v. Davis, supra,* should be applied in civil rights litigation brought under Title VII (or 42 U.S.C. § 1981). The Supreme Court held

1. The record before this court contains no evidence of discriminatory intent. Plaintiffs argue that it was the avowed policy of the management officers prior to 1973 to exclude women "per se" from police work. The affidavits, however, do not support this contention. The statements attributed to Chief Davis give no indication that women "per se" were being excluded; his references to men and women were entirely consistent with the legitimate purposes of the then current classification. If anything, the evidence here shows an intent not to discriminate. For instance, the defendants challenge the minimum height requirement. The City has always had a minimum height requirement, even when all "Police Offi-

cers" were men. The minimum height was 5' 9" in 1919. This was lowered to 5' 8" in 1954, and to 5' 7" in 1971. It was lowered again in 1974 to the present requirement of 5' 6", for the specific purpose of lessening the impact on female applicants.

2. In *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Supreme Court expressly stated that they were not presented with a contention ". . . that the substantive provisions of Title VII as applied here are not a proper exercise of congressional authority under § 5 of the Fourteenth Amendment." *Id.* at 456, 96 S.Ct. at 2671, n.11.

in *Fitzpatrick*, supra, [427 U.S. at 453, [96 S.Ct. at 2670, 49 L.Ed.2d at 620], that the authority for the 1972 amendment extending Title VII to state and local governments was the fourteenth amendment * * *. Therefore, it is simple logic that a statute can be no broader than its Constitutional base. Consequently, since the extension of Title VII to state and local government rests upon the fourteenth amendment, the statute cannot be any broader than the Constitutional authority upon which it is based. It follows that in Title VII cases against a state or local government the statute is to be construed in accordance with the Constitutional test adopted by the Court in Washington, supra; i. e., there must be proof of discriminatory racial purpose." 430 F.Supp. at 514–515.

The Ninth Circuit has not addressed the constitutional question of the proper scope of Title VII as applied to state and local governments. The Circuit has considered the problem of the requirements of a prima facie case under Title VII, using a "probative" approach. *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir. 1971). In that case, the court upheld a trial court's finding that a prima facie case of discrimination had been established. The appellant sought a reversal on the ground that the prima facie case had been based upon statistics alone. In affirming the decision below, the court said:

> "We are not faced with a situation where a court has relied upon statistical data alone. On the contrary, in its findings, the district court cited specific instances of discrimination on the part of the unions and the apprenticeship committees. Thus the statistical evidence is complementary rather than exclusive." 443 F.2d at 551.

The Fourth Circuit has adopted a similar approach in *Roman v. ESB, Inc.*, 550 F.2d 1343 (4th Cir., 1976). After analyzing earlier decisions in that circuit, the *Roman* court suggests that statistical impact alone may be sufficient to establish a prima facie case only where the proof discloses "no objective standards based on education, experience, ability, length of service, reliability, or aptitude to account for the preferential employment . . ." 550 F.2d at 1350.

## C. PLAINTIFFS' EVIDENCE

■ The only evidence plaintiff has offered to support the Title VII claim is statistical analyses of the effect of defendants' height and physical abilities requirements. Statistical comparisons and exhibits often give rise to an inference of racial discrimination. However, the same inference does not necessarily follow when a claim of sexual discrimination is asserted. Contrary to the usual situation involving racial discrimination against a Black, there are obvious physical differences between males and females. If these differences are relevant to an important governmental objective, then the inference of a discriminatory purpose is improper.

■ Furthermore, an inference raised from statistics is not conclusive proof of discrimination. It merely shifts the burden of proof to the defendant. Statistical evidence does not relieve the court of its obligation to determine whether the plaintiffs have established the truth of their allegations. The defendant may overcome a prima facie case by producing credible evidence which rebuts an inference of discrimination. The defendant is not required to produce a preponderance of such evidence; the risk of nonpersuasion remains with the plaintiff. Thus, the City may refute any inference of discrimination by introducing evidence that explains their employment practices on the basis of legitimate non-discriminatory grounds.

The plaintiff's proof, as noted earlier, consists solely of a showing of statistical impact. There is no separate evidence of a discriminatory pattern or policy. Even if we are to assume, arguendo, that the plaintiff's statistics give rise to an inference of illegal discriminatory motives, the inference has been rebutted by uncontroverted evidence in the record.

## D. DEFENDANTS' EVIDENCE

The defendants have offered abundant proof of the objectivity of the requirements of physical size and strength. Plaintiffs urge that the defendants' proof of the job-relatedness of its employment practices does not "validate" the practices in the manner recommended in the EEOC regulations. There is no magic in any validating procedure, and the defendants need only supply competent and relevant evidence on this issue. As the Supreme Court said in *Washington v. Davis*:

> "It appears beyond doubt by now that there is no single method for appropriately validating employment tests for their relationship to job performance." 426 U.S. at 247, n.13, 96 S.Ct. at 2051.

The more obscure the justifications are, the more searching the inquiry must be. Conversely, the more obvious the relationship between the classification and the job requirements, the less searching the inquiry becomes.

The defendants' affidavits, for the most part, merely point out what is obvious and needs little proof. The affidavits suggest that a stronger and taller officer can more quickly and effectively control another person in the event of a confrontation. This officer is more likely to be able to do so without having to resort to extreme force, such as the use of a gun or a dangerous control hold. In self-defense situations, the taller and stronger officer is more likely to be successful. The taller the officer, the better his opportunity to observe, evaluate, and properly judge situations in the field. Furthermore, the series of tests to which plaintiffs object was designed by a professional kinesiologist employed by the City specifically to formulate a relevant physical ability test. The expert's opinion that the physical ability test has a direct and rational relationship to the tasks performed by Police Officers, affirms the obvious facts.[3]

Plaintiffs have also contended that defendants' evidence of job relatedness is refuted by the fact that several other police departments use men and women as Police Officers, with less stringent entrance requirements than the City of Los Angeles. Of course, an effective police force can be structured to include both male and female officers. However, this fact does not support plaintiffs' contention that physical size and strength have no relation to the job's requirements. In such an organization sex differences are almost certainly recognized. These characteristics probably influence the job assignments made at the administrative level. Certainly, a sane chief of police would not dispatch a group of women of average female height, weight, and strength to contain a public uprising such as the "Watts riots", when the same number of men possessing the height, weight, and strength of average males are available.

The Los Angeles Police Department could be so structured as to permit the employment of an equal percentage of male and female applicants. However, the City has chosen to have a police department where every officer is able to meet any confrontation with the minimum amount of necessary force. In reviewing the City's plan, this court must not lose sight of the well established rule that a government has traditionally been granted the widest latitude in the dispatch of its own internal affairs. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

---

**3.** Plaintiffs have filed an affidavit by George H. McGlynn, who purports to be an expert in the effects of stress and fatigue on muscle strength and endurance. Plaintiffs rely upon this affidavit to demonstrate a factual dispute with respect to the propriety of the defendants' physical tests. The McGlynn affidavit states:

> "I will testify that the *only* job related preemployment physical test for a job such as a police officer is a cardiovascular efficiency test . . . ."

This statement is inappropriate and without significance in this inquiry. The proposed test determines only whether the particular person is "physically fit". It fails to take into account the wide range of quality-performance variables among those applicants who could successfully pass the cardiovascular efficiency test proposed by the affiant. The defendants' selection tests determine the degree of performance-quality and permit the City to discover the best qualified applicants. In my view, this affidavit raises no issue of fact.

*Rizzo* involved a claim under 42 U.S.C. § 1983, for an alleged pattern of unconstitutional police mistreatment of minority citizens and city residents in general. The district court ordered the city to submit a program for handling citizen's complaints of police misconduct. A proposed program was thereafter negotiated between the parties and was included in the final judgment of the district court. The Supreme Court held this action was an unwarranted intrusion by the federal judiciary into the discretionary authority committed to the state under the Eleventh Amendment. The Court stated:

> "When a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with 'the well-established rule that the Government has traditionally been granted the widest latitude in the "dispatch of its own internal affairs." ' [citations omitted] The District Court's injunctive order here, significantly revising the internal procedures of the Philadelphia police department, was indisputably a sharp limitation on the department's 'latitude in the "dispatch of its own internal affairs." ' " 423 U.S. at 378–79, 96 S.Ct. at 608.

Our inquiry here cannot extend to the wisdom of the City's decision on the type of police force it desires, nor to possible alternatives directed toward the accomplishment of sociological goals. The question before us is simply, "Does the Los Angeles plan come within permissible constitutional and statutory limits?"

### E. TITLE VII CONCLUSIONS

■ If the court applied the intent standard enunciated in *Scott v. City of Anniston, supra,* there is no evidence of an intent to discriminate, and the Title VII claim must fail. Assuming that the Ninth Circuit or the Supreme Court decides that the *Duke Power Co.* impact standard applies to state and local governments, the Title VII claim would still fail. The undisputed facts before this court are such that the court must conclude as a matter of law that the qualifying tests are appropriate for the se-lection of qualified applicants for the job in question. The situation here is similar to that in *Washington v. Davis, supra,* 426 U.S. at 245–46, 96 S.Ct. 2040, where the Supreme Court stated that it was "untenable" that a verbal abilities test for a police officer position was improper, even if it excluded a large number of Negroes.

### V. CUT–OFF SCORES

■ The plaintiffs claim that the cut-off scores which have been established with respect to the physical abilities test are discriminatory, because they exclude a significantly greater percentage of women. The contention is that the defendants have failed to set these scores at a level reasonably consistent with the normal job requirements. Plaintiffs admit, however, that a cut-off score, although discriminatory, is permissible if the test is job related or "validated". This was made clear in *Griggs v. Duke Power Co.,* where the Court said:

> "Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devises and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant. What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract." 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971).

As noted earlier, the validity of these tests has been established by defendants' evidence. In addition, the tests were designed by professionals for the express purpose of testing applicants for the type of police work which is now being done in the Los Angeles area. Since the tests are job related, the setting of cut-off scores is a

matter for the employer's judgment. Many factors may go into this decision, such as the number of applicants available, the cost of failures in training and on the job, the critical nature of the job to be performed, and the level of performance at which the employer desires employees to perform.

## VI. POLICE ACADEMY

The plaintiffs challenge the program at the Los Angeles Police Academy on the ground that its physical training requirements are set so high that more females fail to meet them than males. A resolution of this issue involves the same considerations which we have previously discussed. The Academy's training program, insofar as it relates to physical performance, is closely related to the job requirements. Therefore, the statistical impact upon women is not relevant.

## VII. PERSONNEL POLICIES

Plaintiffs have attacked the defendants' personnel policies as they relate to job assignments, pay grades, promotions, and pensions. This challenge is predicated upon the assumption that the employment policies of the defendants at the entry level or at other times during a plaintiff's employment, have been impermissibly discriminatory. It is not contended that these policies, in and of themselves, contain provisions which create a disproportionate impact upon females. A finding that the employment policies of the defendants are in other respects proper is a complete response to this challenge.

## VIII. NO AFFIRMATIVE ACTION REQUIRED

Plaintiffs have claimed that defendants' failure to take affirmative action constitutes unlawful discrimination. Plaintiffs contend that defendants should have accelerated hiring and promotion of women to remedy the effects of past discrimination.

Like some of the other contentions made by the plaintiffs, this charge assumes past illegal discrimination in hiring and promotions. In light of this court's finding that the evidence in the record before us fails to establish any prior illegal discriminatory practices in hiring and promotions, defendants are entitled to summary judgment on this issue.

## IX. VETERAN'S PREFERENCES

Although plaintiffs' complaint attacks the use of veteran's preferences in the defendants' employment practices, plaintiffs have since withdrawn that attack and the issue is no longer before this court.

## X. CONCLUSION

The keystone of the plaintiffs' case is their contention that a woman can perform all the tasks involved in the performance of the job of Police Officer. Plaintiffs therefore conclude that the City must establish employment practices which will result in an equal proportion of male and female applicants being accepted as Police Officers. Assuming, arguendo, that women can perform all of these tasks to some degree, the fact remains that many men, because of their physical characteristics, can perform certain important functions better than a large majority of women. As the Supreme Court said in *Griggs v. Duke Power Co., supra* at 436, 91 S.Ct. at 856:

> "Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins."

There is nothing in Title VII which would require an employer to hire a qualified woman in preference to a more qualified man. Title VII was enacted to eliminate sex as a factor in the employment context, not to establish it as a primary consideration.

The City of Los Angeles has decided to establish a police force with certain characteristics that are related to the proper exercise of its police powers. The fact that proportionately more men than women possess the desired characteristics does not invalidate the City's decision, unless there is some discriminatory intent not shown here.

I find, therefore, that upon the record before this court there is no genuine issue as to any material fact to be litigated, and that the defendants are entitled to judgment as a matter of law.

Let summary judgment issue in favor of the defendants.