Fanchon BLAKE et al.,
Plaintiffs-Appellants,

v.

CITY OF LOS ANGELES et al.,
Defendants-Appellees.

Nos. 77–3595, 77–3601.

United States Court of Appeals,
Ninth Circuit.

May 2, 1979.

Cecil W. Marr, Deputy City Atty. (argued), Los Angeles, Cal., for plaintiffs-appellants.

Timothy B. Flynn (argued), Los Angeles, Cal., for defendants-appellees.

Before HUFSTEDLER and TANG, Circuit Judges, and SOLOMON,* District Judge.

HUFSTEDLER, Circuit Judge:

Appellants brought this class action charging the City of Los Angeles, the Los Angeles Board of Civil Service Commissioners, and Edward M. Davis, then Chief of Police of the Los Angeles Police Department, with sex discrimination in employment in the Los Angeles Police Department ("LAPD"). The appellants represent a class of women who are past, present, and future applicants for, employees in, and retirees from sworn positions in the LAPD. Appellants claimed violations of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §§ 2000e *et seq.*), the Fourteenth Amendment of the United States Constitution, and the Civil Rights Act of 1871 (42 U.S.C. § 1983). After certifying the class, the district court granted summary judgment to the appellees. Appellants appeal from the summary judgment, and the City cross-appeals from the class certification order.

We reverse the summary judgment and hold that (1) appellants met their burden of proving a prima facie case that the appellees violated Title VII before July 1, 1973, by maintaining sex-segregated job classifications, and after July 1, 1973, by using selection devices, including a height requirement and a physical abilities test that dis-

---

* Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, sitting by designation.

proportionately excluded women from employment, (2) appellees' use of sex-segregated job classifications between March 24, 1972, and July 1, 1973, violated Title VII because it was not mandated by business necessity, (3) appellees were not entitled to summary judgment with respect to employment practices used after July 1, 1973, because they failed to show that the questioned employment practices were justified as a matter of law under the required standards for business necessity, (4) the gender-based classification system used by appellees before Title VII became applicable to governmental agencies violated the equal protection clause of the Fourteenth Amendment. Because we reverse and remand the case to the district court for trial, we decline to reach the merits of the class certification order.

## FACTUAL BACKGROUND

Prior to July 1, 1973, the LAPD maintained separate, gender-based job classifications in entry-level police positions. Men in the "policeman" classification performed general police patrol assignments and could be promoted through all ranks of the department. Women in the "policewoman" classification generally performed "tasks relating to women and children, desk duty, and administration." Policewomen were barred from regular police patrol assignments and were ineligible for promotion above the level of sergeant. Between 1970 and 1973 no women were appointed to sworn positions in the LAPD, although the department hired more than 2,000 men. The percentage of women in sworn positions in the LAPD declined from 2.62 percent in 1970 to 2.15 percent in 1973.

Beginning on July 1, 1973, the LAPD abandoned the sex-segregated job classifications and established a single entry-level position of "police officer" for both men and women. The department unified its lines of promotion and imposed identical entry requirements on both male and female applicants for "police officer" positions. "Police officers" initially were required to be at least 5′ 7″ in height; this

requirement subsequently was lowered to 5′ 6″ where it remains today. The department also instituted a physical abilities test, which all applicants for "police officer" positions were required to pass. In 1976, three years after the "unisex" job classification program had been established, women occupied only 2.08 percent of all sworn positions in the LAPD and only 0.48 percent of all positions in the ranks of sergeant and above.

The district court found that appellants' sex discrimination claims spanned three time periods of distinct legal significance. The first period antedated March 24, 1972, when Title VII became applicable to governmental agencies. The district court held that the dual classification system in effect during this period did not violate the equal protection clause of the Fourteenth Amendment because it was "substantially related to and serve[d] . . . the important governmental objective of providing an effective police force." (*Blake v. City of Los Angeles* (C.D.Cal.1977) 435 F.Supp. 55, 61.)

The second period was between March 24, 1972, and July 1, 1973, the date when the LAPD abolished the sex-segregated job classification system. The district court held that the dual classification system did not violate Title VII during this period because its continuation was justified by "business necessity." The dual classification system was found not to be a violation of the Fourteenth Amendment for reasons mentioned above.

The final period was the time after July 1, 1973, the date when the unisex "police officer" classification was instituted. The district court held that "undisputed facts" established that the entry requirements for police positions, including the height requirement and the physical abilities test, violated neither the Fourteenth Amendment nor Title VII. Appellants' Fourteenth Amendment claim was rejected because the district court found no evidence of discriminatory intent. The district court held that discriminatory intent also must be proved to establish a Title VII violation by an agency of local government. Thus ap-

pellants' Title VII claim was rejected, although the district court concluded that the LAPD's height requirement and physical abilities test "imposed a severe adverse impact upon women." (*Blake v. City of Los Angeles, supra,* 435 F.Supp. 55, 62.) The district court held, alternatively, that no Title VII violation could be shown even under the impact standard of *Griggs v. Duke Power Co.* (1971) 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, because the height requirement and physical abilities test "are appropriate for the selection of qualified applicants" as a matter of law. (*Blake v. City of Los Angeles, supra,* 435 F.Supp. at 66.)

## I

### TITLE VII CLAIMS

■ Appellants contended that the LAPD violated Title VII before July 1, 1973, by maintaining sex-segregated job classifications, and after July 1, 1973, by using selection devices, including a height requirement and physical abilities test, that disproportionately exclude women from employment.[1] A three-part inquiry is required to decide whether Title VII has been violated. (*Dothard v. Rawlinson* (1977) 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786; *Albemarle Paper Co. v. Moody* (1975) 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280; *DeLaurier v. San Diego Unified School District* (9th Cir. 1978) 588 F.2d 674, 676.) The first question is whether plaintiffs have established a prima facie case of employment discrimination. (*Dothard v. Rawlinson, supra,* 433 U.S. at 329, 97 S.Ct. 2720.) If a prima facie case has been shown, the burden then shifts to the employer to justify the employment practice in question. (*Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. 849.) If the employer meets his burden of justification, plaintiffs may

then show that alternative selection devices exist that would serve the employer's legitimate interests without discriminatory effects. (*Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 425, 95 S.Ct. 2362.)

### *Prima Facie Case of Discrimination*

Although the district court recognized that, under *Griggs v. Duke Power Co., supra,* a prima facie Title VII violation can be established by "the mere showing of a disproportionate impact" of an employment practice on a group protected by Title VII (*Blake v. City of Los Angeles, supra,* 435 F.Supp. at 63), the court held that the *Griggs* impact standard could not constitutionally be applied to agencies of state and local government. Relying on *Scott v. City of Anniston* (N.D.Ala.1977) 430 F.Supp. 508, the district court reasoned that Congress had no constitutional power to impose on state and local governments anti-discrimination standards greater than those compelled by the equal protection clause of the Fourteenth Amendment. Because the Supreme Court in *Washington v. Davis* (1976) 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, held that proof of discriminatory purpose was needed to establish a violation of the equal protection clause, the same standard must be engrafted on Title VII in actions against state and local governments. The premise of the argument is that "it is simple logic that a statute can be no broader than its Constitutional base." (430 F.Supp. at 515.) The premise is wrong because it misconceives controlling authority interpreting both the Fourteenth Amendment and Title VII.

In *Katzenbach v. Morgan* (1966) 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828, the Supreme Court held that Congress' power under Section 5 of the Fourteenth Amendment to enforce that amendment by "ap-

---

1. Title VII provides in pertinent part: "(a) It shall be an unlawful employment practice for an employer—(1) to fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." (42 U.S.C. § 2000e–2(a).)

propriate legislation" is not limited to prohibiting state action that itself violates the Constitution. *Katzenbach* upheld the constitutionality of Section 4(e) of the Voting Rights Act of 1965, prohibiting certain uses of a literacy test to determine voter qualifications. Although the Supreme Court previously held that use of literacy tests to determine voter qualification did not violate the Fourteenth Amendment (*Lassiter v. Northampton County Board of Elections* (1959) 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072), *Katzenbach* held that Congress could determine that legislation banning use of literacy tests was "appropriate" to enforce the Fourteenth Amendment. In upholding congressional determinations of the efficacy of imposing bans on the use of such tests to implement the Fourteenth Amendment, the Supreme Court observed that "[i]t is enough that we may be able to perceive a basis" for the legislation. (384 U.S. at 653, 86 S.Ct. at 1725.)

 The 1972 amendments extending the coverage of Title VII to state and local governments were enacted by Congress pursuant to Section 5 of the Fourteenth Amendment.[2] (*Fitzpatrick v. Bitzer* (1976) 427 U.S. 445, 453 & n.9, 96 S.Ct. 2666, 49 L.Ed.2d 614.) In enacting this legislation, Congress clearly intended to apply the *Griggs* "impact" standard to state and local governments. As the Supreme Court said in *Dothard v. Rawlinson* (1977) 433 U.S. 321, 332 n.14, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786: "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike. See H.R.Rep.No.92–238, 92d Cong., 1st Sess., p. 17 (1971); S.Rep.No.92–415, 92d Cong., 1st Sess., p. 10 (1971)." In reviewing the constitutionality of Congress' extension of the *Griggs* impact standard to state and local governments, we need only consider whether the 1972 amendments to Title VII were "appropriate legislation" to enforce the equal protection clause of the Fourteenth Amendment. (*Katzenbach v. Morgan, supra,* 384 U.S. at 651, 86 S.Ct.

1717.) The 1972 amendments are appropriate legislation to enforce the equal protection clause if they are " 'plainly adapted to that end' and . . . not prohibited by but . . . consistent with 'the letter and spirit of the constitution.' " (*Katzenbach v. Morgan, supra,* 384 U.S. at 651, 86 S.Ct. at 1724 (*quoting McCulloch v. Maryland* (1819) 4 Wheat. 316, 421, 4 L.Ed. 579).)

 Congress enacted the 1972 amendments to Title VII after taking notice of findings "that widespread discrimination against minorities exists in State and local government employment." (H.R.Rep.92–238, 1972 U.S.Code Cong. & Admin.News, pp. 2137, 2152.) It was plainly within Congress' authority to determine that implementation of the equal protection clause required extension of the *Griggs* impact standard to state and local governments. (*See Katzenbach v. Morgan, supra,* 384 U.S. at 653, 86 S.Ct. 1717.) The means chosen by Congress are rationally related to the goal of enforcing the equal protection clause's prohibition of discrimination. The 1972 amendments are consistent with the letter and spirit of the Constitution. Because Congress acted pursuant to Section 5 of the Fourteenth Amendment, the Tenth Amendment does not foreclose application of the *Griggs* impact standard to state and local governments (*cf. Fitzpatrick v. Bitzer, supra* (Eleventh Amendment does not bar congressional provision for awards of backpay and attorneys' fees in Title VII actions against state)), regardless of any limitations it may impose on Congress' Commerce Clause powers (*see National League of Cities v. Usery* (1976) 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245).

We agree with the Seventh Circuit that "since the 1972 Amendments are clearly rationally related to and consistent with 'the letter and spirit' of the Fourteenth Amendment, and the means chosen were not in themselves unconstitutional, . . Congress could constitutionally incorporate the *Griggs* test into the 1972 Amendments." (*United States v. City of Chicago* (7th Cir.

---

2. Section 5 of the Fourteenth Amendment provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

**1374**

1978) 573 F.2d 416, 423–24.) We therefore hold that Title VII applies the *Griggs* impact standard to both public and private employers alike, as numerous courts have recognized. (*United States v. City of Chicago, supra*; *United States v. Virginia* (E.D.Va.1978) 454 F.Supp. 1077, 1084, *overruling Friend v. Leidinger* (E.D.Va.1977) 446 F.Supp. 361, 384–87; *Harrington v. Vandalia-Butler Board of Education* (S.D. Ohio 1976) 418 F.Supp. 603, 607; *see also United States v. City of Buffalo* (W.D.N.Y. 1978) 457 F.Supp. 612; *League of United Latin American Citizens v. City of Santa Ana* (C.D.Cal.1976) 410 F.Supp. 873; *Officers for Justice v. Civil Service Commission of San Francisco* (N.D.Cal.1975) 395 F.Supp. 378.) The district court erred in holding that appellants were required to present evidence of discriminatory intent to defeat the City's motion for summary judgment.

The district court concluded that even if the *Griggs* impact standard was applied, appellees would still be entitled to summary judgment. This conclusion was based in part on the district court's holdings that continuation of gender-based job classifications and use of the physical abilities test and height requirement was justified by "business necessity" (issues we discuss *infra*). But the district court also concluded that appellants' evidence about the impact of the post-1973 selection standards would be insufficient to establish a prima facie case of sex discrimination even under the *Griggs* standard.

■ The City does not claim that appellants failed to show a prima facie case of discrimination under the *Griggs* standard for the gender-based job classifications in effect before July 1, 1973. The district court recognized that appellees "do not claim that the dual classification system for Policemen and Policewomen in effect during this period would comply with the requirements of Title VII." (*Blake v. City of Los Angeles, supra*, 435 F.Supp. at 61.) The undisputed total exclusion of women from regular police patrol work and positions

above the level of sergeant unmistakably established a prima facie case of sex discrimination. Thus, the burden shifted to appellees to justify use of these practices after March 24, 1972.[3]

The undisputed evidence revealed that the 5′ 6″ height requirement excluded 87 percent of all women, but only 20 percent of all men between the ages of 18 and 79. The 5′ 7″ requirement excluded 95 percent of all women, but only 32 percent of all men. (*See also* Note, "Height Standards in Police Employment and the Question of Sex Discrimination," 47 S.Cal.L.Rev. 585, 588 n.13.) The physical abilities test excluded half of all women who took it, but only 2.6 percent of all men who took the test. Although the district court recognized that the height requirement and the physical test had a severe adverse impact on women (435 F.Supp. at 62), it nevertheless concluded that appellants had failed to show a prima facie case of discrimination arising from the use of either or both of these qualifications.

■ Despite the court's recognition that most disparities of this kind based upon statistical comparisons "often give rise to an inference of racial discrimination," the court concluded that "the same inference does not necessarily follow when a claim of sexual discrimination is asserted." The district court did not explain why gross disparities established through statistical comparisons are probative of racial discrimination, but not similarly probative of sexual discrimination. However, the district court did not have the benefit of *Dothard v. Rawlinson* (1977) 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786, which reached the opposite conclusion. *Dothard*, decided six weeks after *Blake*, held that a prima facie case of sex discrimination was established from national census statistics showing that a 5′ 2″ height requirement disproportionately excluded women from positions as Alabama Correctional Counselors. *Dothard* leaves no doubt that a showing of disproportionate impact is all that is required to establish a

---

**3.** The question whether defendants met their burden of justification with respect to the gen-

der-based job classification is discussed at pp. 1375–1376, *infra*.

prima facie case of discrimination, whether it be racial or sexual discrimination. "[T]o establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern." (433 U.S. at 329, 97 S.Ct. at 2726.) No inference of discriminatory purpose need be drawn for the statistics to establish prima facie discrimination, because discriminatory intent need not be shown in Title VII actions. (*United States v. City of Chicago, supra,* 573 F.2d 416.)

The conclusion follows that appellants established a prima facie case of sex discrimination by establishing a disproportionate impact by statistical methods indistinguishable from those in *Dothard.* Thus, the burden shifted to appellees to justify use of the challenged selection devices. (*See, e. g., United States v. City of Buffalo* (W.D.N.Y.1978) 457 F.Supp. 612, 622, 625 (disproportionate impact of written test and height requirements establishes prima facie case of discrimination); *Officers for Justice, supra,* 395 F.Supp. 378, 380, 382 (disproportionate impact of height requirement and physical test established prima facie case of discrimination).)

Appellees argued that the disproportionate exclusion of women was not as bad as it looked from the statistics because fewer women than men were interested in police work. The contention is not relevant. The challenged qualifications disproportionately excluded women who were interested enough to apply. Moreover, even if appellees had proved that women were less interested than men in police work, which they did not, the disinterest itself may be traceable to the Police Department's use of selection devices that would disproportionately exclude women. As the Supreme Court observed in *Dothard* : "The application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." (433 U.S. at 330, 97 S.Ct. at 2727.)[4]

The fact that there are physical differences between males and females, including the fact that men, as a group, tend to be taller and physically stronger than women as a group, does not erode the prima facie inference of discrimination that flows from a showing of statistically disproportionate impact. "Similarly, the statistical disparity here between male and female performance on the physical agility test establishes the *prima facie* case of sex discrimination, with the burden shifting to the defendants to show that the selection device is job-related. If defendants establish to the court's satisfaction that the upper body strength which the test primarily measures is necessary to patrol work, they will prevail, not because the plaintiffs have not established the *prima facie* case, but because the necessity for proper job performance of the skills measured by the selection device permits use of the device despite its adverse impact. Defendants' argument errs in that it takes as given the precise fact that the law requires defendants to prove." (*Officers for Justice, supra,* 395 F.Supp. at 382 n.1.)

### *"Business Necessity" Defense*

Because undisputed evidence before the district court established a prima

4. *See* Note, "Height Standards in Police Employment and the Question of Sex Discrimination," 47 S.Cal.L.Rev. 585, 598–99 (1974). Nothing this court said in *United States v. Ironworkers Local 86* (9th Cir. 1971) 443 F.2d 544, supports appellees' notion that plaintiffs are required to go beyond a showing of disproportionate impact to establish a prima facie violation of Title VII. Our statement that the use of statistics "is conditioned by the existence of proper supportive facts" meant only that statistics should be used properly and should not be used to make inferences they do not support. Appellants here properly used statistics to establish the disproportionate impact of appellees' selection devices. They did not need to make any greater showing to establish a prima facie case of sex discrimination. As we stated in *Ironworkers*: "It is our belief that the often-cited aphorism, 'statistics often tell much and Courts listen,' has particular application in Title VII cases." (443 F.2d at 551 [footnote omitted].)

facie case of sex discrimination, the burden shifted to defendants to show that "business necessity" justified their employment practices. (*Griggs, supra,* 401 U.S. at 431, 91 S.Ct. 849.) As the *Dothard* Court explained: "[o]nce it is thus shown that the employment standards are discriminatory in effect, the employer must meet 'the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question.' *Griggs v. Duke Power Co., [supra,]* 401 U.S. at 432, 91 S.Ct. 849." (*Dothard, supra,* 433 U.S. at 329, 97 S.Ct. at 2726.) Administrative convenience is not a sufficient justification for the employer's practices. Rather, "a discriminatory employment practice must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." (*Dothard, supra,* 433 U.S. at 332 n.14, 97 S.Ct. at 2728; *deLaurier v. San Diego Unified School Dist.* (9th Cir. 1978) 588 F.2d 674, 678.)

■ Until July 1, 1973, the LAPD maintained sex-segregated job classifications that barred all women from police patrol work and prohibited women from being promoted above the level of sergeant. The district court recognized, and appellees conceded, that the dual classifications system did not comply with the requirements of Title VII. Yet the district court, citing *Robinson v. Lorillard Corp.* (4th Cir. 1971) 444 F.2d 791, held that continuation of the practice was justified by "business necessity." The district court reasoned that "the City made a good faith effort to comply with the Act, and that the time required to put the revised hiring practices into effect was not unreasonable under the circumstances." (*Blake, supra,* 435 F.Supp. at 61–62.)

The district court misapprehended the impact of *Robinson v. Lorillard Corp., supra,* 444 F.2d 798. The *Robinson* court had held that "[t]he test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact." (444 F.2d 791, 798 [footnotes omitted].) There was no evidence before the district court that the use of sex-segregated job classifications was necessary to the safe and efficient operation of the Los Angeles Police Department; moreover, there was abundant evidence that less discriminatory alternatives were available. Indeed, the very fact that the Department has successfully functioned since the dual classification system was abolished suggests that the old system was not required by compelling business purposes. (*Cf. Schick v. Bronstein* (S.D.N.Y.1978) 447 F.Supp. 333 (height requirement does not serve an important governmental objective as department acknowledged by abolishing it); *Schaefer v. Tannian* (E.D.Mich.1974) 394 F.Supp. 1128, *remanded on other grounds* (6th Cir. 1976) 538 F.2d 1234 (former practice restricting women to positions in Women's Division does not meet "business necessity" test).) No changed circumstances have been suggested that would justify the former prohibition of police patrol assignments for women in light of their subsequent successful performance on patrol. Thus, the LAPD's use of the dual classification system cannot be justified on the grounds of business necessity.

■ The district court attempted to justify a continuation of the dual classification system after March 24, 1972, on the ground that continuation of the discriminatory system was necessary to maintain a functioning police department during the transition period. The district court's conclusion was based upon its prior erroneous conclusion that the earlier segregative system was justified on business necessity grounds and on the further assumption that a grace period should be implied similar to that accorded private employers when Title VII was first enacted in 1964. The inference properly to

be drawn by Congress' express grant of a one-year grace period to private employers in 1964, and an omission to grant a similar grace period when public employers were added to Title VII in 1972, is that Congress deliberately withheld any grace period. The legislative history of the 1972 amendments to Title VII enforces our conclusion. "Legislation to implement this aspect of the Fourteenth Amendment is long overdue." (H.Rep.92–238, 1972 U.S.Code Cong. & Admin.News, pp. 2137, 2154.) Nothing in the history suggests that Congress intended to permit public employers to delay compliance because immediate compliance with the law would be administratively inconvenient.

We conclude that the LAPD's use of sex-segregated job classifications prior to July 1, 1973, violated Title VII. Appellees completely failed to carry their burden of proving a business necessity to justify the Department's discriminatory system maintained in violation of Title VII.

We turn to the selection devices used by LAPD after July 1, 1973. Despite their exclusionary impact on women, the appellees sought to justify the Department's height requirement and physical abilities test as "job-related" measures of qualities important to successful performance of police tasks. The district court accepted the appellees' contentions and held that "[t]he undisputed facts before this court are such that the court must conclude as a matter of law that the qualifying tests are appropriate for the selection of qualified applicants for the job in question." (435 F.Supp. at 66.) Accordingly, the district court granted summary judgment to the appellees despite the proved exclusionary impact on women of these qualifications in the period after July 1, 1973.

█ The district court's conclusions appear to be, once again, based upon a misunderstanding of the "business necessity" defense and of the relation of the concept of "job relatedness" to the business necessity defense. "Job relatedness" is relevant only for the purpose of trying to prove that the characteristics which the various tests select are directly related to the business necessity. The term "job related" generally is used to refer to the capacity of selection devices to measure traits that are important to successful job performance. The process of determining whether a selection device is sufficiently job related to comply with the requirements of Title VII has been referred to as "validation." It is not enough that the device selects characteristics that may have some rational relationship to job performance; "a discriminatory employment practice must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." (*Dothard, supra,* 433 U.S. at 332, n.14, 97 S.Ct. at 2728.)

█ Because the "business necessity" defense is very narrow, it is not easy for employers to demonstrate the job relatedness of selection devices shown to be prima facie violations of Title VII. (*See Albemarle, supra,* 422 U.S. at 425–36, 95 S.Ct. 2362.) An employer who tries to show job relatedness as a matter of law on a motion for summary judgment faces an even greater challenge. Summary judgment, of course, is appropriate only if the evidence before the district court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Fed.R. Civ.P., Rule 56(c).) All of the intendments are against the party who is moving for summary judgment. (*Adickes v. Kress & Co.* (1970) 398 U.S. 144, 158–61, 90 S.Ct. 1598, 26 L.Ed.2d 142; *United States v. Diebold, Inc.* (1962) 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176; *Stansifer v. Chrysler Motors Corp.* (9th Cir. 1973) 487 F.2d 59, 63.) Meticulous review of the record convinces us that the appellees were not entitled to summary judgment because appellees failed to show that their selection devices were so job related as to be justified by business necessity.

█ The district court did not specify the legal standard it applied to determine that the LAPD's selection devices were "appropriate" as a matter of law. Yet it is apparent from the district court's opinion and the evidence in the record that proper

Title VII standards were not applied. For example, the district court concluded that "[t]he situation here is similar to that in *Washington v. Davis, supra,* 426 U.S. at 245–46, 96 S.Ct. 2040, where the Supreme Court stated that it was 'untenable' that a verbal abilities test for a police officer position was improper, even if it excluded a large number of Negroes." (435 F.Supp. at 66.) However, when the Supreme Court reached this conclusion in *Washington v. Davis,* it was applying the Constitution and *not* Title VII. (*Washington v. Davis, supra,* 426 U.S. at 245–46, 96 S.Ct. at 2050 ("it is untenable that the Constitution prevents the Government" from using a verbal abilities test).) The Supreme Court recognized that Title VII imposed a more stringent standard. "Under Title VII . . . it is an insufficient response to demonstrate some rational basis for the challenged practices. It is necessary in addition, that they be 'validated' in terms of job performance . . . . However this process proceeds, it involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is appropriate under the Constitution . . . ." (*Washington v. Davis, supra,* 426 U.S. at 246–47, 96 S.Ct. at 2051.[5])

The degree of justification the district court required for the LAPD's selection devices fell far short of the "business necessity" required by Title VII. The district court stated that because the asserted relationship between the LAPD's selection devices and police duties was "obvious," a less-searching inquiry into their job relatedness was necessary. Noting that there is no single, appropriate method for validating employment test, the district court held that "defendants need only supply competent and relevant evidence on this issue." The district court based its award of summary judgment on defense affidavits, which "for the most part, merely point out

what is obvious and needs little proof." (435 F.Supp. at 65.) We disagree with the district court that, under Title VII, use of the selection devices could be justified in this manner.

█ To justify the use of pre-employment selection devices as a business necessity, an employer must show that the tests or requirements are so closely job related that their use is "necessary to safe and efficient job performance." (*Dothard, supra,* 433 U.S. at 332 n.14, 97 S.Ct. at 2728.) Thus, the burden of demonstrating the job relatedness of selection devices cannot be easily satisfied. (*See Officers for Justice, supra,* 395 F.Supp. at 384 (the large exclusionary impact of certain selection devices requires "a very high degree of persuasion" for defendants to justify their use).) It is not a burden that can be carried by the assertion of an "obvious," but unmeasured, relationship between selection standards and qualities thought necessary for job performance. (*Dothard, supra,* 433 U.S. at 331, 97 S.Ct. 2720.) Rather, it is essential that selection devices be "validated" by professionally-acceptable methods. (*Albemarle, supra,* 422 U.S. at 431, 95 S.Ct. 2362; *see Washington v. Davis, supra,* 426 U.S. at 247 & n.13, 96 S.Ct. 2040.)

In *Albemarle,* the Supreme Court explained the legal standard for determining the job relatedness of selection devices: "discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.'" (422 U.S. at 431, 95 S.Ct. at 2378.) The validation process thus involves at least two distinct aspects. The employer first must determine what "important elements of work behavior" are. Then he must demonstrate that his selection devices are "predictive of or signifi-

---

**5.** The district court's erroneous application of the constitutional standard of *Washington v. Davis* apparently was the source of its conclusion that the LAPD's selection devices were "appropriate" as a matter of law. Selection devices that are insufficiently job related to

comply with Title VII may be able to pass muster when the less stringent constitutional standard is applied. *See Smith v. City of East Cleveland* (N.D.Ohio 1973) 363 F.Supp. 1131, *rev'd in part, aff'd in part sub nom. Smith v. Troyan* (6th Cir. 1975) 520 F.2d 492.

cantly correlated" with the elements of work behavior that have been identified as important.

■ Validation studies must employ professionally-acceptable methods to increase the likelihood of obtaining trustworthy results. Courts have recognized that a number of validation techniques are professionally acceptable. (*See Washington v. Davis, supra,* 426 U.S. at 247 n.13, 96 S.Ct. 2040 (describing three professional methods of validation).) The Equal Employment Opportunity Commission ("EEOC") has incorporated these techniques into guidelines that outline minimum standards for professional validation studies. (29 C.F.R. § 1607.) The Supreme Court has held that the EEOC guidelines are "entitled to great deference" from courts determining whether employment selection devices comply with Title VII. (*Griggs, supra,* 401 U.S. at 434, 91 S.Ct. 849. *See Washington v. Davis, supra,* 426 U.S. at 247 n.13, 96 S.Ct. 2040; *Albemarle, supra,* 422 U.S. at 430–35, 95 S.Ct. 2362.) Although compliance with the EEOC guidelines is not mandatory, an employer's burden of justification is much heavier if the guidelines have not been followed. (*United States v. City of Chicago, supra,* 573 F.2d at 427.) [6]

■ When the proper legal standard for determining business necessity under Title VII is applied to the evidence in the record, it is apparent that appellees were not entitled to summary judgment. Appellees failed to establish that the LAPD's selection devices were so closely job related that their use was justified by business necessity. At most, they showed that there was some rational relationship between their selection devices and certain elements of job performance by police. While this may have been sufficient to satisfy the district court's relaxed standard of review, it fell far short of demonstrating business necessity for the selection devices.

■ Appellees offered two general justifications for use of the height requirement. They argued that taller officers could more easily control resisting suspects with a minimum use of force and that taller officers had better capacities to observe field situations. They made no attempt to verify empirically the latter justification and the affidavits submitted in support of this theory were insufficient to warrant summary judgment on the issue. (*See United States v. City of Buffalo, supra,* 457 F.Supp. at 625–26; *United States v. Virginia, supra,* 454 F.Supp. at 1088 (opinion evidence that "height and weight are useful in police work" does not prove job relatedness, but rather only "a good faith belief of job-relatedness").) [7] To demonstrate business necessity under the former rationale, appellees would have to show: (1) that subduing suspects with a minimum use of force is an important element of job performance by police, and (2) that height is so significantly correlated with minimization of force in suspect control as to be necessary to safe and efficient job performance by police. Although the Police Department's job analysis indicated that control of resisting suspects occupies only a minor part of police duties, for present purposes we assume, *arguendo,* that it is permissible to require all police to be capable of subduing suspects with a minimum use of force.[8] Even on

---

**6.** The EEOC guidelines are designed to help employers determine whether their selection devices comply with Title VII: The reason that it is important to follow the EEOC guidelines is because they incorporate professional procedures for test validation that are thought to insure more reliable results. The fact that it may be difficult to professionally validate selection devices does not excuse non-compliance with professional procedures; rather, it suggest that employers should be more cautious in employing selection devices that have discriminatory impacts.

**7.** Shorter officers may have certain advantages in observing field situations (*e. g.,* the ability to look under objects, the ability to squeeze through narrow passageways) that taller officers lack. The City failed to demonstrate that the net advantages of height in observing field situations were sufficiently great to make the 5′ 6″ height requirement a business necessity.

**8.** *See* the discussion of the availability of less discriminatory alternatives, *infra* at 1381. The City's job analysis concluded that an officer had to wrestle with a suspect only once every

these assumptions, appellees failed to demonstrate that the LAPD's height requirement is so significantly correlated with minimization of force as to make it a business necessity.

The City presented the results of two empirical studies in an effort to validate the height requirement. The first study attempted to correlate the height of police officers with resistance offered by suspects and force employed by officers. Based on questionnaires returned by arresting officers, the study concluded that while "[t]here is no relationship between officer height and suspect resistance, . . . [s]horter officers use strong force more often than do taller officers." The latter conclusion was based on the study's finding that "strong force" was used in 5 percent of all arrests by officers 5′ 8″ and 5′ 9″ in height, 4.5 percent of arrests by officers 6′ and 6′ 1″ in height, and 3.8 percent of arrests by police 6′ 2″ and taller. The second study, based on simulations of police subduing suspects, concluded that taller officers generally perform the bar-arm control hold better than shorter officers. Appellees argued that shorter officers would be forced to resort to stronger force more frequently than taller officers who could better perform the bar-arm control hold.

Appellants vigorously disputed both the methodology and the findings of these studies. The studies failed to show that persons shorter than 5′ 6″ (the level of the height requirement) would be more likely to use strong force than taller persons, because no data was reported for persons shorter than 5′ 6″. Moreover, they noted that the studies failed to control for the effect of experience and job assignment. Appellants also argued that rater bias may have affected the results of the bar-arm control hold study and that neither study had attempted to differentially validate the effect of height by sex.

Appellants' attacks on the methodology of the studies are more than mere quibbles. Because neither of the studies included persons shorter than 5′ 6″, the studies are of little value in determining whether the height requirement excludes individuals who would be more likely to resort to strong force.[9] This criticism is particularly telling in light of appellants' allegation that unreported data in one of the studies showed that persons 5′ 7″ in height use strong force less frequently than persons between 5′ 8″ and 5′ 11″ in height. The lack of controls for experience may have systematically biased the studies' results because shorter officers may have been less experienced, given the previous reduction in the LAPD's height requirement.[10] The first study's ambiguous definition of "strong force" and the lack of controls for the level of suspect resistance, make it of little value in determining whether shorter officers use more force than would be necessary for taller officers to use.[11] The pos-

20 watches and that an officer was kicked or hit by a subject once every 33 watches.

**9.** The EEOC guidelines recognize that validation studies should include persons who are excluded by the selection standards in question. (*See* 29 C.F.R. § 1607.5)

**10.** The LAPD lowered its height requirement from 5′ 9″ to 5′ 8″ in 1954. Thus, all 20-year veterans on the force would be at least 5′ 9″ in height. If the shorter officers in the study had less job experience, the study's results may be the product of job experience and not height. (*See Boston Chapter, NAACP, Inc. v. Beecher* (1st Cir. 1974) 504 F.2d 1017, 1025; *League of United Latin American Citizens, supra,* 410 F.Supp. at 904; *Officers for Justice, supra,* 395 F.Supp. at 380–81; 29 C.F.R. § 1607.5(b)(4).

**11.** "Strong force" included everything from firing a weapon to use of a baton, sap or bar-arm control hold. The study failed to distinguish between these different levels of force when reporting the results, even though the premise of the second study was that shorter officers would use the bar-arm control hold less frequently than other forms of strong force. Although data on suspect resistance were reported, no controls were introduced in the study to determine if the force used was excessive in relation to the level of suspect resistance. Although defendants argued that the study showed that police 5′ 8″ and 5″ 9″ used strong force 31 percent more frequently than officers 6′ 2″ and taller, in fact all the study showed was that there was a 95 percent chance that the level of force used by officers 6′ 2″ and taller was different from the level of force used by officers 5′ 8″ and 5′ 9″.

sibility of rater bias in the second study is a potentially serious defect, particularly in light of appellants' allegations that the raters were interested in the litigation and aware of the purpose of the study.[12] Appellees' suggestion that methodological defects cannot controvert the probative force of their studies is amply refuted by existing case law. (*Albemarle, supra,* 422 U.S. at 425–35, 95 S.Ct. 2362; *Boston Chapter, NAACP, Inc. v. Beecher* (1st Cir. 1974) 504 F.2d 1017; *League of United Latin American Citizens, supra,* 410 F.Supp. 873; *Officers for Justice, supra,* 395 F.Supp. 378.)

Appellants did not confine their attack to methodological disputes; they also introduced evidence of contrary findings of other studies. They discovered that the City had been involved in four other studies that investigated the relationship of height to job performance by police. Each of these studies had concluded that height was not significantly related to police job performance. One of the studies, the "Drawn Weapon Frequency Survey," had found no correlation between police officer height and the frequency of drawing a weapon. This finding directly contradicted appellees' contention that shorter officers are more likely to use strong force, particularly force stronger than the bar-arm control hold. They also produced numerous depositions from police officials in other major American cities that have reduced or eliminated minimum height requirements for police. This testimony indicated that persons under 5' 6" in height can, and are, safely and efficiently performing all aspects of police work.

Viewing all this evidence in the light most favorable to appellants, appellees failed to establish that the LAPD's height requirement was so manifestly job related as to be justified by business necessity.[13]

Appellees sought to demonstrate the job relatedness of the LAPD's physical abilities test through the results of two validation studies. The first study attempted to correlate performance on the five events used in the physical abilities test with 11 measures of success during Police Academy training.[14] The study found that four of the five events used in the physical abilities test had some significant correlation with at least seven of the 11 measures of training success. The second study concluded that performance on the physical abilities test had some significant correlation with performance of foot pursuit, field shooting, and emergency rescue simulations. Appellees also submitted affidavits detailing the procedures that were used to develop the physical abilities test.

Appellants attacked both the methodology and conclusions of the validation studies,

12. *See Albemarle, supra,* 422 U.S. at 433 n.32, 95 S.Ct. at 2379 ("It cannot escape notice that Albemarle's study was conducted by plant officials, without neutral, on-the-scene oversight, at a time when this litigation was about to come to trial. Studies so closely controlled by an interested party in litigation must be examined with great care.")

13. We express no opinion on the question whether appellees will be able to make a successful showing of business necessity at trial. We only hold that the evidence they presented in support of their motion for summary judgment was insufficient to meet their burden of demonstrating business necessity for the height requirement.

14. The five events on the physical abilities test were: wall scale (running a total of 50 yards and scaling a smooth wall six feet high); hang (running a total of 50 yards and hanging from a chinning bar, using an overhand grip, for one minute); weight drag (running 50 feet and dragging a dead weight of 140 pounds for 50 feet); tremor (running 50 yards and holding a stylus steady for 17 seconds); endurance (running as many laps around a one-eighth mile track as possible in 12 minutes). The 11 measures of success in police academy training were: academy average (combination of academic performance, performance in physical training, marksmanship, and peer evaluations); target shooting III (score received on final test of target shooting performance given in the academy); combat shooting II and III (scores received on last two tests of combat shooting performance); physical training I, II, and III (scores received in the evaluations of performance in the academy physical training exercise program at three different points during training); self-defense (evaluation of self-defense skills at academy); peer evaluations (at 8 weeks and 16 weeks); graduation (whether the officer completed the police academy training course).

contending that because the studies excluded persons who had failed the physical abilities test, they were of little value in demonstrating that the physical test excluded persons who would be unlikely to succeed as police officers. Moreover, appellants noted that the LAPD had not used a pre-employment physical test during the five years prior to the time when women were first permitted to apply for police officer positions. They questioned whether the physical test had been developed to test a representative sample of major or critical work behaviors as revealed by a careful job analysis. Extensive deposition testimony was presented indicating that police departments in other major American cities that do not use pre-employment physical abilities tests have experienced satisfactory job performance by police. Finally, they also questioned appellees' failure to differentially validate the physical abilities test by sex.

Viewing the record in the light most favorable to appellants, we cannot conclude that appellees met their burden of justifying use of the physical abilities test as a business necessity. The fact that the LAPD hired thousands of male police officers between 1968 and 1973 without using any pre-employment physical test suggests that the practice is not essential to safe and efficient job performance.[15] Moreover, the modest correlations between scores of successful candidates on the physical test and scores during academy training on peer evaluations, tests of physical ability and shooting skills, hardly establish that the physical test is so intimately related to job performance as to be a business necessity.[16] Appellees had to demonstrate that their measures of training success are themselves significantly related to important aspects of job performance and they utterly failed to do so.[17]

15. See Officers for Justice, supra, 395 F.Supp. at 385; 29 C.F.R. § 1607.11 ("no new test or other employee selection standard can be imposed upon a class of individuals protected by Title VII who, but for prior discrimination, would have been granted the opportunity to qualify under less stringent selection standards previously in force.")

16. Although appellees' claim that 4 of the 5 events used in the physical abilities test had some significant correlation with at least 7 of the 11 measures of training success sounds impressive, a closer analysis of the study reveals far less impressive results. The 11 measures of academy performance were based only on measures of shooting ability, physical ability, self-defense skills, and peer evaluations. The magnitude of the correlations for all but the 3 measures of physical training were always less than $r = .3$, indicating that less than 9 percent of the variance in the academy performance measures was explained by performance on the components of the physical abilities test. (See Johnston, Econometric Methods 35 (1972).)

17. Appellees offered conclusory affidavits to the effect that the measures of academy performance were themselves significantly related to job performance. For example, a police academy instructor justified the peer evaluation measures on the grounds that "[t]he ability to establish a favorable rapport with peers and the public is an essential requirement for the professional Police Officer." While we do not question the desirability of having police officers with social skills, appellees cannot demonstrate that a physical test is job related because it measures the capacity of police to develop rapport with others in training.

We do not read Washington v. Davis, supra, 426 U.S. at 250–51, 96 S.Ct. 2040, as establishing that selection devices may be validated for Title VII purposes without reference to job performance. Washington v. Davis simply approved the use of a verbal abilities test to determine whether applicants had the capacity to understand a police training program. (See Washington v. Davis, supra, 426 U.S. at 255–56, 96 S.Ct. 2040 (Stevens, J., concurring); but see National Education Association v. South Carolina (1978) 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (White, J., dissenting from summary affirmance).) If employers were permitted to validate selection devices without reference to job performance, then non-job-related selection devices could always be validated through the simple expedient of employing them at both the pre-training and training stage. As the Second Circuit noted in Vulcan Society v. Civil Service Commission (2d Cir. 1973) 490 F.2d 387, 396 n.11: "The danger of distortion in this regard is particularly acute, since performance in the probationary school is also evaluated by means of a written examination. Thus, there is a distinct possibility that a claim that the qualifying examination tests for ability to learn in the probationary school is in fact no more than a claim that performance on the written qualifying examination predicts with reasonable accuracy performance on the written probationary examination. Without evidence that the second examination is job-related, such a demonstration is barren indeed."

Summary judgment on appellants' Title VII claims relating to appellees' post-1973 selection devices must be reversed.[18]

*Availability of Less Discriminatory Alternatives*

■ Even if an employer meets his burden of demonstrating business necessity, Title VII plaintiffs may prevail if they show that alternative selection devices are available that would serve the employer's legitimate interests without discriminatory effects. (*Albemarle, supra,* 422 U.S. at 425, 95 S.Ct. 2362.) Although the judgment must be reversed on the other grounds heretofore discussed, we nevertheless reach the alternative selection aspect of this Title VII action to avoid repetition of error that occurred in granting the motion for summary judgment.

■ The district court concluded that the LAPD "could be so structured as to permit the employment of an equal percentage of male and female applicants," (435 F.Supp. at 65.) However, the court held that the LAPD could not be required to adopt less discriminatory alternatives if they required modification of departmental policies. In support of this proposition, the district court cited *Rizzo v. Goode* (1976) 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561. Compliance with the commands of Title VII may indeed require modification of departmental policies, and nothing in *Rizzo v. Goode* suggests that the contrary is true.

In *Rizzo,* the Supreme Court held that in absence of showing direct responsibility on the part of police officials for violations of rights by a small percentage of the police force, federal courts lacked power to require a local police department to adopt a new civilian complaint processing procedure. In our Title VII case, unlike the

situation in *Rizzo,* the appellees here are themselves charged with violations of federal law. Acting pursuant to its constitutional authority, Congress has removed whatever latitude local police departments may ever have had to engage in sex discrimination. So long as non-discriminatory alternatives serve the legitimate interests of the police in safe and efficient job performance, police departments cannot pursue policies that require the use of selection standards that are themselves prima facie violations of Title VII.

### III

### EQUAL PROTECTION CLAIMS

The district court awarded summary judgment to appellees on the claims founded on the equal protection clause of the Fourteenth Amendment and the Civil Rights Act of 1871. (42 U.S.C. 1983.) The district court held that neither the sex-segregated job classifications used by the LAPD before July 1, 1973, nor the selection devices used by the LAPD after that date, denied appellants equal protection. Because the statutory prohibition of sex discrimination embodied in Title VII is more comprehensive than the constitutional ban, it was unnecessary for the district court to reach the constitutional issue with respect to the selection devices used only after Title VII became applicable to the LAPD. Thus, we express no opinion about the district court's conclusion that no evidence of discriminatory intent supported appellants' constitutional attack on the employment practices used by the LAPD after July 1, 1973. Because the sex-segregated job classifications were used before Title VII became applicable to the LAPD, we review the district court's holding that this practice

---

Here, the strongest correlation shown by appellees' validation study was between performance on the pre-training physical abilities test and performance during training on physical abilities tests. This is not sufficient to validate the use of the physical abilities test without an independent demonstration of its relation to job performance.

18. Because the district court premised its rejection of appellants' challenges to other employment practices of the LAPD on its holding that the physical test and height requirement were appropriate selection devices as a matter of law, we need not discuss the other employment practices appellants challenge. We reverse the district court's award of summary judgment in its entirety.

did not contravene the equal protection clause.

As the district court recognized, undisputed evidence established that the LAPD used a gender-based system of job classifications during the period before Title VII became applicable to agencies of local government. Separate job classifications existed for men and women. Policewomen were not permitted to undertake regular patrol assignments, and they were barred from promotion above the level of sergeant.

In *Craig v. Boren* (1976) 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 the Supreme Court outlined the standard of review to be applied to gender-based classifications under the equal protection clause. The Court held that: "classifications by gender must serve important governmental objectives and must be substantially related to the achievement of those objectives." (429 U.S. at 197, 97 S.Ct. at 457.) Among the objectives that have been held insufficient to justify gender-based classifications are "administrative ease and convenience," and "fostering 'old notions' of role typing." (*Craig v. Boren, supra,* 429 U.S. at 198, 97 S.Ct. at 457; *Frontiero v. Richardson* (1973) 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583; *Stanton v. Stanton* (1975) 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688.

The district court purported to apply the *Craig v. Boren* standard to determine that the LAPD's gender-based job classifications did not violate the equal protection clause. The district court first concluded "that the qualities of disposition, and physical size and strength are substantially related to the important governmental objective of providing an effective police force." (435 F.Supp. at 61.) The district court then considered whether gender was substantially related to the selection of police officers with these qualities. Citing *Schlesinger v. Ballard* (1975) 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610, the district court said that "[t]he Supreme Court has at least implicitly approved the exclusive use of men in combat positions. . . . The same factors of size, strength, and disposition which make a man a more effective combatant

than a woman in the event of war, also act to make a man a better Police Officer than a woman in those areas where physical tasks are involved." (435 F.Supp. at 60.) Thus, the district court concluded that the LAPD's job classifications did not violate the equal protection clause because "a classification based upon gender is substantially related to and serves [the] important governmental objective [of providing an effective police force]." (435 F.Supp. at 61.)

■ Even if we assume, *arguendo,* that qualities of size, strength, and disposition are substantially related to the important objective of maintaining an effective police, it does not follow that women may constitutionally be excluded from serving as police officers. It must also be demonstrated that women lack the requisite size, strength, and disposition to be effective police. The Supreme Court's decision in *Schlesinger v. Ballard* provides no support for the proposition that women cannot be effective police or combatants. The issue in *Schlesinger v. Ballard* was not whether women could be excluded from combat duty, but whether the "disadvantageous conditions suffered by women" who were excluded from certain aspects of military service could be remedied by providing them more time before subjecting them to mandatory discharges. (*Schlesinger v. Ballard, supra,* 419 U.S. at 508, 95 S.Ct. at 577 ("Appellee has not challenged the current restrictions on women officers' participation in combat and in most sea duty."); *Craig v. Boren, supra,* 429 U.S. at 198 n.6, 97 S.Ct. at 457 ("*Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974) and *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975), upholding the use of gender-based classifications, rested upon the Court's perception of the laudatory purposes of those laws as remedying disadvantageous conditions suffered by women in economic and military life.").) The Supreme Court held that a gender-based classification could be used to remedy a disadvantage shared by all members of one sex to which it applied. (*Schlesinger v. Ballard, supra,* 419 U.S. at 508–10, 95 S.Ct. 572.)

Thus, *Schlesinger v. Ballard* provides no authority to support the exclusion of women from police patrol work, though it might support the constitutionality of actions to compensate women for that disadvantage.

■ It is undisputed that not all women lack the requisite traits to be effective police officers. The LAPD's experience since abolition of its gender-based job classifications amply demonstrates that women can be effective police. The district court did not dispute this. Instead, the court held that "[t]here has to be only a substantial relationship between the relevant traits and gender," in order to justify the exclusion of all persons of one gender from positions requiring the relevant traits. (435 F.Supp. at 60.) This conclusion is contrary to the clear teachings of a long line of Supreme Court decisions that "archaic and overbroad generalizations" cannot justify "statutes employing gender as an inaccurate proxy for other, more germane bases of classification." (*Craig v. Boren, supra,* 429 U.S. at 198, 97 S.Ct. at 457; *Weinberger v. Wiesenfield* (1975) 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (financial position of working women); *Frontiero v. Richardson* (1973) 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (financial position of servicewomen); *Reed v. Reed* (1971) 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (capabilities of women to be estate administrators). *Cf. Schlesinger v. Ballard, supra,* 419 U.S. at 508, 95 S.Ct. 572.) The fact that persons of one gender are less likely to possess certain traits than persons of the other gender cannot justify a gender-based classification unless the congruence between gender and possession of the traits is so great, and the prospects of developing more accurate proxies for the traits are so small, that the gender-based classification cannot be said to be based on administrative ease or convenience. (*Craig*

*v. Boren, supra,* 429 U.S. at 198, 97 S.Ct. 451.)

■ We hold that undisputed facts before the district court established that the gender-based job classifications used before Title VII became applicable to the LAPD violated the equal protection clause of the Fourteenth Amendment. Exclusion of all women from regular police patrol duties and from promotions above the level of sergeant was not substantially related to the achievement of an important governmental objective. Because women could have served as effective police officers during this period, we can only conclude that the dual classification system was designed to serve administrative convenience and not to promote the maintenance of an effective police force. Thus, the gender-based classification system violated the equal protection clause, and appellees were not entitled to summary judgment on this portion of the constitutional claim.

## IV

## CROSS–APPEAL OF THE CLASS CERTIFICATION

The district court certified this action as a class action under Rules 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure on June 10, 1976.[19] On July 11, 1977, the district court entered summary judgment in favor of appellees. After appellants filed an appeal from the judgment, appellees filed a cross-appeal from the judgment "insofar as that judgment was based upon the Court's 'Order Certifying Class'." Appellees on cross-appeal ask this court, in the event any issue is remanded for further proceedings, to instruct the district court to re-examine the class certification order. They suggest that the named appellants

---

**19.** The certified class was composed of "all women who are: a) Current and future applicants for all sworn positions at the Los Angeles Police Department, including, but not limited to, current and future applicants for the position of "police officer;" b) All past applicants for sworn positions at the Los Angeles Police Department who applied within the applicable statute of limitations period, including, but not

limited to, applicants for the position of "police officer" (or pre-July 1973 equivalent); c) Current and future employees in sworn positions at the Los Angeles Police Department; d) Current and future retirees from such sworn positions at the Los Angeles Police Department who will be eligible for retirement payments or benefits within the applicable statute of limitations period."

might not adequately represent the interests of the certified class, but they fail to specify any reasons for this fear.

 Orders granting class certification normally are not appealable because they are not "final decisions" within the meaning of 28 U.S.C. § 1291. (*Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891.) Appellees are able to bring their cross-appeal only because the district court's award of summary judgment to them constituted a final judgment. Because the district court's judgment was in appellees' favor, their cross-appeal from the class certification order would have become moot if we had affirmed the district court's judgment. The only reason the class certification issue has not become moot is because we reverse the district court's summary judgment award and remand the case for further proceedings. Under these circumstances, it would not be appropriate for us to decide appellees' cross-appeal challenging the class certification order. The same considerations that normally bar interlocutory review of class certification orders (*see Blackie v. Barrack, supra*, 524 F.2d at 895; *see also Coopers & Lybrand v. Livesay* (1978) 437 U.S. 463, 473, 98 S.Ct. 2454, 2460, 57 L.Ed.2d 351 ("The potential waste of judicial resources is plain.")), persuade us that we should not now review the class certification order merely because the district court erroneously entered summary judgment for appellees. Because we remand the case for further proceedings, the class certification order may be modified later. (Fed.R.Civ. Proc. 23(c)(1).) Nothing precludes appellees from obtaining review of the order after final judgment ultimately is entered. (*Coopers & Lybrand v. Livesay, supra*, 437 U.S. at 469, 98 S.Ct. 2454.)

The judgment is reversed and the cause is remanded to the district court for further proceedings consistent with the views herein expressed. Appellants are awarded their costs together with a reasonable attorney's fee as costs for the successful prosecution of this appeal. (42 U.S.C. § 2000e–5(k).)